**READ MAGAZINE, Inc., et al. v. HANNEGAN.**

Civ. A. No. 30926.

District Court of the United States for the District of Columbia.

Nov. 15, 1945.

John W. Burke, Jr., and Lamar Hardy, both of New York City, and Homer Cummings and William Stanley, both of Washington, D. C., for plaintiffs.

Edward M. Curran, U. S. Atty., and Daniel B. Maher, Asst. U. S. Atty., both of Washington, D. C., for defendant.

HOLTZOFF, Justice.

This is an action against the Postmaster General for an injunction restrain-

ing the enforcement of a so-called "fraud order" issued by him against "Facts" Magazine and certain of its editors. The matter came on to be heard on the plaintiffs' motion for a preliminary injunction. At the conclusion of the hearing, the court indicated that it would advance the action for an immediate trial on the merits and that in the meantime the temporary restraining order, previously issued by another justice of this court, would be continued, subject to certain limitations needed to safeguard the rights of the Government. Counsel for the Government thereupon stated that since all of the pertinent facts were presented in the papers before the court and were not in dispute, he was willing to submit the case for a determination on the merits forthwith and to that end would file a motion for a summary judgment. Counsel for the plaintiffs acquiesced in this suggestion. Accordingly, both parties filed motions for summary judgment. The case will be disposed of on these motions. This procedure is appropriate in a case in which the evidentiary facts are not substantially in dispute, and the conflict arises only concerning the ultimate conclusions to be drawn from uncontroverted facts, Fox v. Johnson & Wimsatt, 75 U.S.App.D.C. 211, 218, 219, 127 F.2d 729; Otis & Co. v. Pennsylvania R. Co., D.C., 61 F.Supp. 905.

The plaintiff, Read Magazine, Inc., is the publisher of a magazine known as "Facts". In April 1945, the magazine published an advertisement inviting the public to participate in a puzzle contest. The Postmaster General ruled that the contest was a fraudulent scheme and on October 1, 1945, acting under Sections 3929 and 4041 of the Revised Statutes, U.S.C.A., Title 39, Secs. 259 and 732,[1] issued a "fraud order" against the magazine and certain of its editors. The order forbid the Postmaster at New York to pay any postal money order drawn to the order of Puzzle Contest, Facts Magazine; Contest Editor, Facts Magazine; Judith S. Johnson, Contest Editor; Miss J. S. Johnson, Contest Editor; Contest Editor; Facts Magazine; and Henry Walsh Lee, Editor in Chief, Facts Magazine; and instructed him to return to the Postmasters at the offices at which they were originally mailed all letters and other mail matter directed to any of the above-mentioned persons or concerns. The mail matter thus returned was to be delivered to the senders thereof with the following words written or stamped on the outside: "Fraudulent: Mail to this address returned by order of Postmaster General". The order further provided that if there was nothing to identify the senders, the mail matter should be sent to the dead letter branch. This ac-

[1] The pertinent portion of U.S.C.A., Title 39, Section 259, reads as follows: "The Postmaster General may, upon evidence satisfactory to him that any person or company is engaged in conducting any lottery, gift enterprise, or scheme for the distribution of money, or of any real or personal property by lot, chance, or drawing of any kind, or that any person or company is conducting any other scheme or device for obtaining money or property of any kind through the mails by means of false or fraudulent pretenses, representations, or promises, instruct postmasters at any post office at which registered letters or any other letters or mail matter arrive directed to any such person or company, or to the agent or representative of any such person or company, whether such agent or representative is acting as an individual or as a firm, bank, corporation, or association of any kind, to return all such mail matter to the postmaster at the office at which it was originally mailed, with the word 'Fraudulent' plainly written or stamped upon the outside thereof; and all such mail matter so returned to such postmasters shall be by them returned to the writers thereof, under such regulations as the Postmaster General may prescribe."

The pertinent portion of U.S.Code, Title 39, Section 732, 39 U.S.C.A. § 732, reads as follows: "The Postmaster General may, upon evidence satisfactory to him that any person or company is engaged in conducting any lottery, gift enterprise, or scheme for the distribution of money, or of any real or personal property by lot, chance, or drawing of any kind, or that any person or company is conducting any other scheme for obtaining money or property of any kind through the mails by means of false or fraudulent pretenses, representations, or promises, forbid the payment by any postmaster to said person or company of any postal money orders drawn to his or its order, or in his or its favor, or to the agent of any such person or company, whether such agent is acting as an individual or as a firm, bank, corporation, or association of any kind, and may provide by regulation for the return to the remitters of the sums named in such money orders."

tion to enjoin the enforcement of the fraud order was brought by the publishers and editors of the magazine and corporations affiliated with the publishers.

The advertisement of the puzzle contest comprised a detailed set of rules. In brief, the contest was to be conducted in the following manner. A group of 80 puzzles, divided into 20 series of four puzzles each, was to be offered for solution. Each entrant was required to pay the sum of fifteen cents on submitting the solutions for each series. In other words, each entrant had to pay in the aggregate the sum of $3 as a fee for his participation in the contest. In case of a tie, an additional group of 80 puzzles was to be solved by the contestants who had not been eliminated. Again, the second group of puzzles was to be divided into 20 series of four puzzles each, and the sum of fifteen cents had to accompany the solution of each series, or in the aggregate a further sum of $3. If there was a tie at the second stage, the same process was to be repeated, with a further sum aggregating $3 to be paid by each contestant. At this third and final stage, however, each competitor would be required to submit, in addition to his solution of the puzzles, a letter on the subject "The Puzzle I Found Most Interesting and Educational in this Contest". If a tie still persisted, the prizes were to be awarded on the basis of the merits of the letters. There were to be 500 cash prizes, aggregating the sum of $17,500. The first prize was to be the sum of $10,000. The purpose of the contest was to advertise a series of books published by the plaintiff, Literary Classics, Inc. At each stage of the contest, each successful competitor was to receive a book published by this plaintiff, said to be worth $3. In each instance the book was a reprint of a well known classic.

The Act under which the Post Office Department acted is a beneficent measure intended to protect the public against fraudulent stratagems and artifices. Its efficacy is found in the fact that it can be used to suppress such schemes summarily and expeditiously, by barring the guilty party from the use of the mails. The history of the administration of the statute indicates that it has been instrumental in protecting the public from imposition by rogues and swindlers. The effectiveness of the statute, however, is due to its exceedingly drastic character, resulting from both the nature of the remedy and the summary manner in which it can be invoked by administrative action.

It seems reasonable to assume that the law was originally directed against schemes that were palpably dishonest and concerns that were obviously fraudulent. To deny to such a person the use of postal facilities is just retribution. A different problem arises, however, when it is attempted to apply this drastic remedy to a borderline case, or to a legitimate concern which is engaged in a business that is admittedly lawful, with the exception of one of many activities. The effect of a fraud order is to stop all mail directed to the person or concern named in it. It necessarily comprehends both mail relating to legitimate business as well as that affecting the fraudulent activities. It even applies to purely personal and social correspondence, including that from members of one's family. It deprives the person affected by the order of the right of access to the principal channel of communication with other members of society. In effect he becomes an outcast or outlaw, and is completely isolated, so far as concerns ordinary and usual means of communication. Such an order results in ignominy and humiliation. Its consequences may be disastrous and even catastrophic.

In Pike v. Walker, 73 App.D.C. 289, 291, 121 F.2d 37, 39, Groner, C. J., pointedly remarked: "Whatever may have been the voluntary nature of the postal system in the period of its establishment, it is now the main artery through which the business, social, and personal affairs of the people are conducted and upon which depends in a greater degree than upon any other activity of government the promotion of the general welfare. Not only this, but the postal system is a monopoly which the government enforces through penal statutes forbidding the carrying of letters by other means."

Recently the same court observed that modern mail service "is a highway over which all business must travel". Esquire, Inc., v. Walker, App.D.C. 151 F.2d 49, 51.

A serious question of statutory construction may perhaps be lurking in this case, namely, whether it was the intent of the Congress that this statute should be applicable against a concern or a person pursuing some activities that are admittedly honest and lawful, in addition to the

scheme branded as dishonest, or whether it was intended to be limited to persons and concerns who engage solely in fraudulent activities. If the former construction is to be adopted, the result is to cut-off a person from receiving any proper mail, or from having any lawful means of communication in respect to his legitimate activities, if he is found guilty of engaging in some other endeavor which is deemed to be fraudulent. This outcome would be a modern form of outlawry, which seems contrary to our fundamental ideals of justice.

The Supreme Court stated in United States v. Kirby, 7 Wall. 482, 486-487, 19 L.Ed. 278: "All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter." See also Rector, etc., of Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226; United States v. American Bell Telephone Co., 159 U.S. 548, 549, 16 S.Ct. 69, 40 L.Ed. 255; Sorrells v. United States, 287 U.S. 435, 446, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249. It is not necessary, however, in the light of the conclusion about to be reached to determine this question of statutory construction.

Assuming that the case is within the statute, it becomes necessary to define the scope and extent of judicial review of a "fraud order" issued by the Postmaster General. The duty of administering the law devolves on him. The discretion is vested in him. The determination of the fact whether a fraudulent scheme is being conducted must be made by him "upon evidence satisfactory to him". The court may not substitute its own judgment for that of the Postmaster General. Neither may it review the weight of evidence and set aside his action merely because the court might have arrived at a different result on the same evidence. If, however, the court reaches the conclusion that there is no substantial evidence to sustain the administrative determination, or if it finds that the administrative action was arbitrary or capricious, or lacking in due process of law

from a procedural standpoint, the court may enjoin the enforcement of the order.

These principles are fully sustained by the authorities. The Supreme Court in the leading case of American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 110, 23 S.Ct. 33, 39, 47 L.Ed. 90, formulated the governing principles as follows: "In such a case as the one before us there is no adequate remedy at law, the injunction to prohibit the further withholding of the mail from complainants being the only remedy at all adequate to the full relief to which the complainants are entitled. Although the Postmaster General had jurisdiction over the subject-matter (assuming the validity of the acts), and therefore it was his duty, upon complaint being made, to decide the question of law whether the case stated was within the statute, yet such decision, being a legal error, does not bind the courts."

In that case the court held that an order withholding mail from a concern teaching mental healing had been erroneously issued and that its enforcement should be enjoined.

In Aycock v. O'Brien, 28 F.2d 817, the Circuit Court of Appeals for the Ninth Circuit thus summarized the applicable rules of law: "While within a limited range courts of equity will grant relief against orders of this character, it is well settled that they will not interfere where there has been no mistake of law, a fair hearing has been accorded, and the findings of the administrative officers upon issues of fact are supported by substantial evidence."

The Circuit Court of Appeals for the Sixth Circuit in Jarvis v. Shackelton Inhaler Co., 136 F.2d 116, 119 enunciated the same doctrine as follows: "The power of a court of equity to review the order is limited. It extends no further than to determine whether there is substantial evidence in fact, as distinguished from opinion, to support the order. If there is, the case is foreclosed against appellee. If there is not, it follows that appellee has suffered irreparable injury to its property rights."

In that case an injunction was granted restraining the enforcement of a fraud order against a concern engaged in manufacturing and marketing an inhaling compound for the relief of colds and similar ailments.

■ On the basis of the authorities, the only question for this court to review in the instant case is whether there was any substantial evidence to sustain the administrative determination that the publishers and editors of Facts Magazine were conducting or operating a scheme or device for obtaining money through the mails by means of fraud, or false pretense, representations or promises. As the facts are not in dispute, the answer to the question depends upon an examination of the advertisement and other literature emanating from the editors of the magazine.

The Postmaster General found three objections to this material. The first objection was that the contest was denominated a "puzzle contest" in large type, while a reading of all of the Rules of the contest printed in small type disclosed that if a number of contestants were tied after two stages of elimination, it would be necessary for the remaining competitors to submit letters in addition to solving puzzles. The Post Office Department took the position that this feature of the contest changed its nature from that of a puzzle contest to what might presumably be called a letter-writing contest and that, therefore, to denominate it a puzzle contest was a misnomer amounting to a fraud. This dispute seems, however, to be solely over nomenclature. The nature of the contest could be ascertained from reading the entire advertisement.

The second objection was that it did not clearly appear from the advertising matter that a contestant might be obliged to remit an aggregate amount of $9 in order to remain in the contest to its final stage. It was merely stated in the announcement that the sum of 15 cents had to accompany the solution of each set of puzzles. The sum total of $9 could be easily reached, however, by a multiplication of the figures appearing in the advertisement.

The third objection was that it was represented to the public that the contestant might become a prize winner merely by submitting correct solutions to the first group of 80 puzzles. The official rules of the contest, however, printed in small type in the body of the advertisement contained an express statement that a large number of entrants was expected and that ties between successful competitors were likely.

Indeed, the advertisement is by no means a model of clarity and lucidity. It is diffuse and prolix, and at times somewhat obscure. Many of its salient provisions are printed in rather small type. An intensive and concentrated reading of the entire text is indispensable in order to arrive at an understanding of the entire scheme. Nevertheless, a close analysis of this material discloses the complete plan. Nothing is omitted, concealed or misrepresented. There is no deception. The well-founded criticisms of the plaintiffs' literature are a far cry from justifying a conclusion that the announcement was a fraud on the public. Similar animadversions may be directed against the typical insurance policy, bill of lading, or express receipt. Some of the vital terms of most of these documents are generally printed in small type and couched in phraseology that is difficult for the average holder of the instrument to comprehend. These considerations, however, do not justify an inference of fraud. Under no circumstances, therefore, can the puzzle contest and its descriptive literature be considered a fraudulent device or strategem for obtaining money. The conclusion is inevitable that there is no evidence to support the finding of fact on which the fraud order is based and that, therefore, the plaintiff is entitled to a permanent injunction against the enforcement of the order.

As in this case this Court sits as a court of equity, it is not amiss to consider and weigh the equities involved. The undisputed facts are that over 189,000 persons entered the contest at its inception. Approximately 35,000 persons were left after the unsuccessful competitors were eliminated at the first stage. Eight thousand more were eliminated at the second stage, and 27,000 entrants still remain at the third and final stage of the contest. Eventually a considerable number of them would become entitled to receive valuable cash prizes, if the contest is carried to a conclusion. Each of these persons has already paid entrance fees aggregating at least $6 and has spent considerable time and effort, which may have been arduous, in solving 160 puzzles. To foreclose the plaintiffs by administrative fiat from carrying the contest to a final termination would seem unfair and inequitable to these 27,000 members of the public, who still remain in the contest and who have invested time, effort, and money.

If we consider the matter from the standpoint of the plaintiffs, we find that although they have received over $760,000

in entrance fees, they have expended or have become obligated to expend, a sum aggregating in excess of $935,000. This total comprises the aggregate cash value of the prizes, amounting to $105,000, the cost of the books that have been distributed, as well as other items of expense in conducting the contest, such as the printing, advertising, postage and other overhead disbursements. Every competitor who has submitted solutions of all the puzzles at either the first or second stage of the contest has received a book, which is a reprint of a well-known classic. Many have received two books. It is quite apparent that the magazine initiated the contest not as a profit-making scheme, but for the purpose of advertising its many publications. In the light of all of these facts and especially because the fraud order did not become effective until after the second stage of the contest had been concluded, it seems inequitable to prevent the contest from proceeding to a final termination.

The plaintiffs' motion for summary judgment is granted. The defendant's motion for summary judgment is denied. Judgment for plaintiffs granting permanent injunction.