## DONALDSON, POSTMASTER GENERAL, *v.* READ MAGAZINE, INC. et al.

No. 50. Argued October 24, 1947. Reargued January 5, 1948.—Decided March 8, 1948.

*Robert L. Stern* argued the cause for petitioner. With him on the briefs were *Solicitor General Perlman* and *Paul A. Sweeney,* and with them was *Assistant Attorney General Ford* on the original argument and *H. Graham Morison, Melvin Richter* and *Alvin O. West* on the reargument.

*John W. Burke, Jr.* argued the cause and filed the briefs for respondents. With him on the brief on the reargument was *Mac Asbill.*

MR. JUSTICE BLACK delivered the opinion of the Court.

This case presents questions as to the validity of an order issued by petitioner, the Postmaster General, which directed that mail addressed to some of respondents be returned to the senders marked "Fraudulent," and that postal money order sums payable to their order be returned to the remitters.

The respondent Publishers Service Company has conducted many contests to promote the circulation of newspapers in which it has advertised that prizes would be given for the solution of puzzles. Through its corporate subsidiaries, respondents Literary Classics, Inc., and Read Magazine, Inc., it publishes books and two monthly magazines called *Read* and *Facts.* The place of business is in New York City.

In 1945 respondents to promote sales of their books put on a nationally advertised project, known as the Facts Magazine Hall of Fame Puzzle Contest. The

Postmaster General after a hearing found "upon evidence satisfactory to him" that the "puzzle contest" was "a scheme or device for obtaining money through the mails by means of false and fraudulent pretenses, representations, and promises, in violation of sections 259 and 732 of title 39, United States Code . . . ." Specifically, the Postmaster General found that the representations were false and fraudulent for two principal reasons. First, that prospective contestants were falsely led to believe that they might be eligible to win prizes upon payment of $3 as a maximum sum when in reality the minimum requirement was $9, and as it later developed they were finally called on to pay as much as $42 to be eligible for increased prize offers. Second, the Postmaster General found that though the contest was emphasized in advertisements as a "puzzle contest" it was not a puzzle contest; that respondents knew from experience that the puzzles were so easy that many people would solve all the "puzzles" and that prizes would be awarded only as a result of a tie-breaking letter-essay contest; and that contestants were deliberately misled concerning all these facts by artfully composed advertisements.

The contest was under the immediate supervision of respondents Henry Walsh Lee and Judith S. Johnson, editor-in-chief and "contest editor" respectively of *Facts*. The Postmaster General's original fraud order related to mail and money orders directed to

"Puzzle Contest, Facts Magazine; Contest Editor, Facts Magazine; Judith S. Johnson, Contest Editor; Miss J. S. Johnson, Contest Editor; Contest Editor; Facts Magazine; and Henry Walsh Lee, Editor in Chief, Facts Magazine, and their officers and agents as such, at New York, New York."

Respondents filed a complaint in the United States District Court for the District of Columbia to enjoin enforcement of the order. They alleged its invalidity on

the grounds that there was no substantial evidence to support the Postmaster General's findings of fraud, and that the statutory provisions under which the order was issued authorize the Postmaster General to act as a censor and hence violate the First Amendment. The District Court issued a temporary restraining order but directed that pending further orders respondents should deposit in court all moneys and the proceeds of all checks and money orders received through the mails as qualifying fees for the Hall of Fame Puzzle Contest. After a hearing the respondents' motion for summary judgment was granted on the ground that the findings were not supported by substantial evidence. 63 F. Supp. 318. The United States Court of Appeals for the District of Columbia affirmed on the same ground, one judge dissenting. 158 F. 2d 542. We granted certiorari.

The case has been twice argued in this Court. Briefs of both parties on the first argument dealt only with the question of whether the Postmaster General's findings of fraud were supported by substantial evidence. But assuming validity of the findings, questions arose during the first oral argument concerning the scope of the fraud order. That order had included a direction to the New York postmaster to refuse to deliver any mail or to pay any money orders to *Facts,* its officers and agents, including its editor-in-chief, who was also editor of *Read.* The two monthly magazines, both published in New York, had an aggregate circulation of nearly five hundred thousand copies. We were told the total deprivation of the right of *Facts* and of the editor of the two magazines to receive mail and to cash money orders would practically put both magazines out of business. See *Milwaukee Publishing Co.* v. *Burleson,* 255 U. S. 407. Furthermore, the order was of indefinite duration and *Facts* and its affiliates have made a business of conducting contests to promote the circulation of books

and magazines. The order, if indefinitely enforced, might have resulted in barring delivery of mail and payment of money orders in relation to other non-fraudulent contests as well as legitimate magazine business. All of the foregoing raised questions about the validity and scope of the original order, if unmodified, which we deemed of sufficient importance to justify further argument. For that reason we set the case down for reargument, requesting parties to discuss the validity and scope of the order, and whether, if invalid by reason of its scope, it could be so modified as to free it from statutory or constitutional objections.[1]

Thereafter, and before reargument, the Postmaster General revoked the order insofar as it applied to *Facts* magazine, its editor-in-chief, and its officers and agents.

---

[1] "This case is ordered restored to the docket for reargument. On reargument counsel need not further discuss the sufficiency of the evidence to support the Postmaster General's findings. They are requested to discuss the following:

"1. Does the fraud order prohibit delivery of mail and postal money orders to Facts Magazine and all its employees, including its editor-in-chief? If so,

"(a) Is the order within the Postmaster General's authority under 39 U. S. C. Secs. 259, 732?

"(b) If so, do these code provisions, in violation of the First Amendment or any other constitutional provisions, abridge the freedom of speech or press of either the senders or the sendees of the mail or the money orders?

"2. Does the fraud order prohibit indefinitely the delivery of mail or money orders which relate to subject matters or contests other than the contest on which the order is based? If so,

"(a) Is the order within the Postmaster General's statutory authority?

"(b) If so, are these code provisions in conflict with the Constitution of the United States?

"3. Assuming that the order is in conflict with the code provisions or the Constitution, can it be modified in such way as to free it from statutory or constitutional objections? If so, by whom can the order be modified and by what procedure?"

As modified, the order bars delivery of mail and payment of money orders only to addressees designated in the contest advertisements:

"Puzzle Contest, Facts Magazine; Contest Editor, Facts Magazine; Judith S. Johnson, Contest Editor; Miss J. S. Johnson, Contest Editor; Contest Editor."

The Postmaster General, so we are informed, does not construe the modified order as forbidding delivery of mail or payment of money orders to *Facts* magazine or even to Miss Judith (J. S.) Johnson, individually. So construed, the order is narrowly restricted to mail and money orders sent in relation to the Hall of Fame Puzzle Contest found fraudulent, and would not bar deliveries to the magazines, to their editor, or to the three corporate respondents. It would bar deliveries to Judith (J. S.) Johnson, only if sent to her at the designated address and in her capacity as "Contest Editor." Likewise the District Court's order impounding funds is limited to qualifying fees received in the Hall of Fame Puzzle Contest. If the Postmaster General's action in modifying the order is valid, the questions we asked to have argued have largely been eliminated from the original order.

Respondents' contentions now are: (1) The Postmaster General lacked power to modify his original fraud order, and hence that order remains subject to any and all of its original infirmities. (2) The findings on which the order is based are not supported by substantial evidence. (3) The statutes under which the order was issued violate various constitutional provisions.

*First*. Respondents' contention that the Postmaster General was without power to modify the order by elimination of *Facts* magazine, its editor, and its officers and agents is based almost entirely on their two other grounds for asserting invalidity of the order. Of course, if the order were wholly invalid as to all of the respondents for these reasons, it could not have been validated

merely by eliminating some of them from its terms. But laying aside respondents' other contentions for the moment, we have no doubt as to the Postmaster General's authority to modify the fraud order.

Having concluded that the original order was broader than necessary to reach the fraud proved, the Postmaster General not only possessed the power but he had the duty to reduce its scope to what was essential for that purpose. The purpose of mail fraud orders is not punishment, but prevention of future injury to the public by denying the use of the mails to aid a fraudulent scheme. See *Comm'r* v. *Heininger*, 320 U. S. 467, 474. Such orders if too broad could work great hardships and inflict unnecessary injuries upon innocent persons and businesses. No persuasive reason has been suggested why the Postmaster General should be without power to modify an order of this kind. Such an order is similar to an equitable injunction to restrain future conduct, and like such an injunction should be subject to modification whenever it appears that one or more of the restraints imposed are no longer needed to protect the public. *United States* v. *Swift & Co.*, 286 U. S. 106, 114; see *Skinner & Eddy Corp.* v. *United States*, 249 U. S. 557, 570.

Furthermore, the modification here involved was for respondents' benefit; it gave them a part of the very relief for which they prayed. It removed the ban against delivery of mail and payment of money orders to their magazine, its editor and its agents—a ban which we were told would have done them irreparable injury if left in effect. The possibility that another order might be entered against the eliminated respondents is too remote to require us to consider the original order as though the modification had never been made. See *United States* v. *Hamburg-American Co.*, 239 U. S. 466, 475–476.

Nor does the modification subject respondents to any disadvantage in this case in reference to the impounded funds. Those funds are sums sent in as qualifying fees for the scheme found fraudulent. They are in court custody because of the court's restraining order; but for it they would have been returned to the senders as ordered by the Postmaster General. Now, as before the fraud order was modified, their disposition is dependent entirely upon the validity of the finding of fraud. Respondents could thus claim the funds only by asserting a right growing out of the scheme found fraudulent. The court having lawful command of such funds must allocate them to the remitters if the order is valid. See *Inland Steel Co.* v. *United States,* 306 U. S. 153, 156–158; *United States* v. *Morgan,* 307 U. S. 183, 194–195.

*Second.* Respondents contend that there was no substantial evidence to support the Postmaster General's findings that they had represented that prizes could be won (1) on payment of only three dollars as contest fees or (2) by the mere solution of puzzles. They say that the very advertisements and circular letters to contestants from which these inferences were drawn by the Postmaster General contained language which showed that the first $3 series of puzzles might result in ties, making necessary a second and maybe a third $3 puzzle series, and that if these three efforts failed to determine the prize winners, they would then be selected on the basis of competitive letters, written by the tied contestants on the subject "The Puzzle I Found Most Interesting and Educational in This Contest."

There were sentences in the respondents' advertisements and communications which, standing alone, would have conveyed to a careful reader information as to the nine-dollar fees and the letter-essay feature of the contest. Had these sentences stood alone, doubtless the

fraud findings of the Postmaster General would not have been justified. But they did not stand alone. They were but small and inconspicuous portions of lengthy descriptions used by respondents to present their contest to the public in their advertisements and letters. In reviewing fraud findings of the Postmaster General, neither this Court nor any other is authorized to pick out parts of the advertisements on which respondents particularly rely, decide that these excerpts would have supported different findings, and set aside his order for that reason. We consider all the contents of the advertisements and letters, and all of the evidence, not to resolve contradictory inferences, but only to determine if there was evidence to support the Postmaster General's findings of fraud. *Leach* v. *Carlile*, 258 U. S. 138, 140.

Respondents' advertisements were long; their form letters to contestants discussing the contest, its terms, and its promises were even longer than the advertisements. Paradoxically, the advertisements constituted at the same time models of clarity and of obscurity—clarity in referring to prizes and to a "puzzle contest," obscurity in referring to a remote possibility of a letter-essay contest. In bold type, almost an inch high, their advertisements referred to "$10,000 FIRST PRIZE PUZZLE CONTEST." Time after time they used the words "puzzle" and "puzzle contest." Conspicuous pictures of sample "puzzles" covered a large part of a page. Rebus "puzzles" Nos. 1 to 4 of the contest were there. An explanation of what each represented appeared above it. The first, it was explained, represented "the inventor of the phonograph and electric light," the second "a Republican President who became Chief Justice of the Supreme Court." The last two contained equally helpful clues to the "puzzles." The advertisements left no doubt that the contest presented an opportunity to win large prizes in connection

with solution of puzzles, which puzzles, to say the least, would not be too taxing on the imagination.

Readers who might have felt some reluctance about paying their money to enter an essay contest were not so impressively and conspicuously informed about that prospect; here the advertisement became a model of obscurity. In the lower left corner of one of the advertising pages appeared the "Official Rules of the Contest," to which rules references were carefully placed in various parts of the advertisement, and which were printed, as the District Court's opinion observed, "in small type." There were ten rules. About the middle of Rule 9 appeared the only reference to the possible need for letters as a means of breaking ties. And it is impossible to say that the Postmaster General drew an unreasonable inference in concluding that competitive letter-writing thus obscurely referred to was mentioned only as a remote and unexpected contingency. The same kind of obscurity and doubt occurs in reference to the cost of the contest. The District Court in an opinion holding that the Postmaster General's findings were not supported by the evidence had this to say about one advertisement which was widely used:

> "Indeed, the advertisement is by no means a model of clarity and lucidity. It is diffuse and prolix, and at times somewhat obscure. Many of its salient provisions are printed in rather small type. An intensive and concentrated reading of the entire text is indispensable in order to arrive at an understanding of the entire scheme. Nevertheless, a close analysis of this material discloses the complete plan. Nothing is omitted, concealed or misrepresented. There is no deception. The well-founded criticisms of the plaintiffs' literature are a far cry from justifying a conclusion that the announcement was a fraud on

"the public. . . . The conclusion is inevitable that there is no evidence to support the finding of fact on which the fraud order is based and that, therefore, the plaintiff is entitled to a permanent injunction against the enforcement of the order."

We agree with the District Court that many people are intellectually capable of discovering the cost and nature of this contest by "intensive and concentrated reading" and by close analysis of these advertisements. Nevertheless, we believe that the Postmaster General could reasonably have concluded, as he did, that the advertisements and other writings had been artfully contrived and composed in such manner that they would confuse readers, distract their attention from the fact that the scheme was in reality an essay contest, and mislead them into thinking that they were entering a "rebus puzzle" contest, in which prizes could be won by an expenditure of not more than $3. That respondents' past experience in similar contests enabled them to know at the beginning that essay writing, not puzzle solutions, would determine prize winners is hardly controvertible on this record. That experience was borne out in this contest by the fact that of the 90,000 contestants who submitted answers to the first series of 80 puzzles, 35,000 solved all of them, and of that number 27,000 had completed the first set of "tie-breaking puzzles" when the fraud order was issued. Under the circumstances, to advertise this as a puzzle contest instead of what it actually was cannot be attributed to a mere difference in "nomenclature"; such conduct falls far short of that fair dealing of which fraud is the antithesis.

Advertisements as a whole may be completely misleading although every sentence separately considered is literally true. This may be because things are omitted that should be said, or because advertisements are composed or purposefully printed in such way as to mislead. *Wiser*

v. *Lawler,* 189 U. S. 260, 264; *Farley* v. *Simmons,* 99 F.
2d 343, 346; see also cases collected in 6 Eng. Rul. Cas.
129–131. That exceptionally acute and sophisticated
readers might have been able by penetrating analysis to
have deciphered the true nature of the contest's terms
is not sufficient to bar findings of fraud by a fact-finding
tribunal. Questions of fraud may be determined in the
light of the effect advertisements would most probably
produce on ordinary minds. *Durland* v. *United States,*
161 U. S. 306–313, 314; *Wiser* v. *Lawler, supra* at 264;
*Oesting* v. *United States,* 234 F. 304, 307. People have
a right to assume that fraudulent advertising traps will
not be laid to ensnare them. "Laws are made to protect
the trusting as well as the suspicious." *Federal Trade
Comm'n* v. *Standard Education Society,* 302 U. S. 112,
116.

The Postmaster General found that respondents' adver-
tisements had been deliberately contrived to divert read-
ers' attention from material but adroitly obscured facts.
That finding has substantial support in the evidence. The
District Court and the Court of Appeals were wrong in
holding the evidence insufficient.

*Third.* It is contended that §§ 259 and 732 of 39
U. S. C., the sections under which this order was issued,
are in conflict with various constitutional provisions and
that the statutes should be held unenforceable for this
reason. Specifically, it is argued that the sections author-
ize a prior censorship and thus violate the First Amend-
ment; authorize unreasonable searches and seizures in vio-
lation of the Fourth Amendment; violate the due process
clause of the Fifth Amendment; deny the kind of trial
guaranteed in criminal proceedings by the Sixth Amend-
ment and by Art. III, § 2, cl. 3; and inflict unusual pun-
ishment in violation of the Eighth Amendment.

In 1872 Congress first authorized the Postmaster Gen-
eral to forbid delivery of registered letters and payment of

money orders to persons or companies found by the Postmaster General to be conducting an enterprise to obtain money by false pretenses through the use of the mails. 17 Stat. 322–323, 39 U. S. C. § 732. In the same statute Congress made it a crime to place letters, circulars, advertisements, etc., in the mails for the purpose of carrying out such fraudulent artifices or schemes. 17 Stat. 323, 18 U. S. C. § 338. In 1889 Congress declared "non-mailable" letters and other matter sent to help perpetrate frauds. 25 Stat. 874, 39 U. S. C. § 256. In 1895 the Postmaster General's fraud order powers were extended to cover all letters or other matter sent by mail. 28 Stat. 964, 39 U. S. C. § 259. And Congress has passed many more statutes, such, for illustration, as the Securities and Exchange Act, 48 Stat. 77, 906, 15 U. S. C. § 77 (e), and the Federal Trade Commission Act as amended, 52 Stat. 114, 15 U. S. C. § 52, to protect people against fraudulent use of the mails.

All of the foregoing statutes, and others which need not be referred to specifically, manifest a purpose of Congress to utilize its powers, particularly over the mails and in interstate commerce, to protect people against fraud. This governmental power has always been recognized in this country and is firmly established. The particular statutes here attacked have been regularly enforced by the executive officers and the courts for more than half a century. They are now part and parcel of our governmental fabric. This Court in 1904, in the case of *Public Clearing House* v. *Coyne,* 194 U. S. 497, sustained the constitutional power of Congress to enact the laws. The decision there rejected all the contentions now urged against the validity of the statutes in their entirety, insofar as the present contentions have any possible merit. No decision of this Court either before or after the *Coyne* case has questioned the power of Congress to pass these

laws. The *Coyne* case has been cited with approval many times.

Recognizing that past decisions of this Court if adhered to preclude acceptance of their contentions, respondents urge that certain of our decisions since the *Coyne* case have partially undermined the philosophy on which it rested. Respondents refer particularly to comparatively recent decisions under the First and Fourteenth Amendments.[2] None of the recent cases to which respondents refer, however, provide the slightest support for a contention that the constitutional guarantees of freedom of speech and freedom of the press include complete freedom, uncontrollable by Congress, to use the mails for perpetration of swindling schemes.

We reject the contention that we should overrule the *Coyne* case and declare these fraud order statutes to be wholly void and unenforceable.

An additional argument urged by respondents is that the fraud order statutes as interpreted and applied by the Postmaster General in this case violate some of the constitutional provisions above mentioned. We consider this suggestion only in connection with the modified order. Its future effect is merely to enjoin the continuation of conduct found fraudulent. Carried no further than this, the order has not even a slight resemblance to punishment—it only keeps respondents from getting the money of others by false pretenses and deprives them of a right to speak or print only to the extent necessary to protect others from their fraudulent artifices. And so far as the impounding order is concerned, of course respondents can have no just or legal claim to money

---

[2] *Grosjean* v. *American Press Co.,* 297 U. S. 233, 245–249; *Near* v. *Minnesota,* 283 U. S. 697, 713, *et seq.*; *Bridges* v. *California,* 314 U. S. 252, 260–263; *Craig* v. *Harney,* 331 U. S. 367; *Milwaukee Publishing Co.* v. *Burleson,* 255 U. S. 407.

mailed to them as a result of their fraudulent practices. Nor does the modified order jeopardize respondents' magazine except to the extent, if any, that its circulation might be dependent on monies received from this contest scheme found fraudulent. A contention cannot be seriously considered which assumes that freedom of the press includes a right to raise money to promote circulation by deception of the public.

The order as modified is valid and its enforcement should not have been enjoined. The judgments of the United States Court of Appeals for the District of Columbia and of the District Court are reversed. The cause is remanded to the District Court to dismiss the petition for injunction and to provide for proper return to the remitters of the impounded funds sent in response to the fraudulent advertisements and communications.

*It is so ordered.*

MR. JUSTICE BURTON, with whom MR. JUSTICE DOUGLAS concurs, dissenting.

The two lower courts reviewed in detail the facts in this case. Both held that the predecessor of the present Postmaster General exceeded his authority in issuing his stringent order of October 1, 1945. The modification of that order on December 8, 1947, by the present Postmaster General, then serving as Acting Postmaster General, has restricted it to appropriate parties. It has not altered, however, the primary basis for the lower court's injunction of November 27, 1945, against the enforcement of the order. That injunction was granted because the record failed to show evidence sufficient to justify the drastic administrative action taken in reliance upon the lottery and fraud sections of the mail and money order statutes. R. S. §§ 3929 and 4041, as amended, 26 Stat. 466, 28 Stat. 964; 39 U. S. C. §§ 259 and 732. This dissent

protests the overruling of the conclusions of the lower courts on this issue and seeks especiälly to discourage any increase, or even repetition, of the degree of censorship evidenced by this order.

The former Postmaster General applied here the drastic summary police powers entrusted to his office by Congress to deal with fraudulent swindlers using the mail in the conduct of lotteries or any other scheme for obtaining money by false or fraudulent pretenses. No charge of a lottery or scheme of chance was made the basis for the order before us. This particular puzzle and letter-writing contest, to which the order was limited, was a contest of the familiar type which offers prizes and thereby seeks to attract prospects for later sales. The sponsor candidly stated that this contest was conducted for advertising purposes and it distributed to the contestants samples from a series of books published by its subsidiary, Literary Classics, Inc. The entrance fees of 15 cents, required to accompany the respective sets of puzzle solutions, might well add up to more than all the expenses of the program, including the substantial prizes, provided the responses were many. Such fees, however, would fail to meet those expenses if the responses were few. The financial success of the contest depended upon the number of volunteers choosing to enter it.

The District Court found:

> "These considerations, . . . , do not justify an inference of fraud. Under no circumstances, therefore, can the puzzle contest and its descriptive literature be considered a fraudulent device or strategem [stratagem] for obtaining money. The conclusion is inevitable that there is no evidence to support the finding of fact on which the fraud order is based and that, therefore, the plaintiff is entitled to a permanent injunction against the enforcement of the order."
> *Read Magazine* v. *Hannegan,* 63 F. Supp. 318, 322.

The Court of Appeals found:

"Appellant does not claim that any statement in the advertisements was untrue or that there was any departure from the procedure announced in the Official Rules of the Contest. There is no claim by him that the judging of the letters was to be other than bona fide, or that any contestant failed to receive the promised books. No contestant, so far as the record shows, complained of being misled or defrauded. In other words, the fraud order is not premised upon specific or affirmative misstatements, or upon failure to perform as promised, but is premised upon an impression which appellant says is conveyed by the advertisements as a whole. He derives the impression from the headlines in the advertisements and the comparative urgency which he finds in some of the expressions in them.

.        .        .        .        .

"To support appellant's conclusion in this case, one must ascribe to the advertisements an impression directly contrary to the stated rules of the contest. One must thus assume that readers were led not to read the Rules, or were led to ignore them or to misunderstand them or to believe something else contrary to their statement. There is no evidence, we think, to support any of those assumptions. The Rules were legibly printed. They were emphasized, rather than minimized, in the text. They were clear to any reasonable mind. No contradictory expressions occurred elsewhere.

"That this contest was an advertising device designed to promote the book-publishing business of appellees must have been plain to the most casual reader. The advertisements specifically told him, 'This contest with FACTS MAGAZINE as sponsor,

is being presented as a means of popularizing the Literary Classics Book Club.' . . .

"We fail to see that the letters which were written to the contestants who successfully solved the first series of puzzles, cast any complexion upon the venture different from that cast by the original advertisements themselves.

.     .     .     .     .

"We think that the advertisements before us fairly urged contestants to read the Rules and that the Rules stated fairly, in style of type, placement, and terms, what was proposed.   That being so, and there being no ambiguity in or departure from the proposals stated, a finding of false pretenses, representations, or promises could not properly be made." *Hannegan* v. *Read Magazine,* 81 U. S. App. D. C. 339, 341–343, 158 F. 2d 542, 544, 545–546.

Not only do I fail to find adequate reason to overrule the findings and conclusions of the two lower courts but, on examination of the record, I agree with them.   I believe that the Postmaster General exceeded his authority when he applied his drastic censorship and fraud order to this particular program.   There was no compulsion on anyone to enter this contest.   Everyone who did so received, as advertised, certain reprints of classical literature and, until the contest was stopped, each contestant had the advertised opportunity to win certain cash prizes.

Anyone who entered this contest to win substantial prizes by doing so little to win them should at least examine the exact terms of the contest and make himself responsible for meeting the rules prescribed by those offering to make the gifts he sought.   The contestants rendered no services for which they had a right to compensation.   They merely paid a small entrance fee.   For that they were entitled to have the contest conducted in accordance with the rules stated.

The findings of the lower courts make it clear that there has been no claim of failure or impending failure by the sponsor to carry out the terms of the contest. The record shows no complaint from any contestant. Nevertheless, the Postmaster General took it upon himself to stop the contest. On the evidence before him and before the courts, this was an abuse of his discretion. It was "palpably wrong and therefore arbitrary." See *Leach* v. *Carlile*, 258 U. S. 138, 140.