**UNITED COMMERCIAL INSURANCE SERVICES, et al., Plaintiffs,**

v.

**UNITED STATES POSTAL SERVICE, Defendant.**

Civ. A. No. 86–3139.

United States District Court, District of Columbia.

Dec. 18, 1986.

John W. Vardaman, Jr., F. Lane Heard III, Williams & Connolly, Washington, D.C., for plaintiffs.

Sandra C. McFeeley, U.S. Postal Service and Paul L. Colby, Asst. U.S. Atty., Washington, D.C., for defendant.

## OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiffs United Commercial Insurance Services (UCIS), Burton Rayden and Jeffrey Rayden are licensed insurance brokers and agents who sell through the mails forgery and check alteration insurance and service contracts for mechanical checkwriter machines. Since 1977, plaintiffs have mailed approximately 40 million applications for these services. After receiving complaints about plaintiffs' solictations, defendant filed an administrative complaint in 1984 alleging that the mailings were in the guise of an invoice and falsely represented that the recipient had a prior relationship with plaintiffs, had already agreed to purchase plaintiffs' services, and that the stated price of these services was an amount due and owing UCIS. After a three-day hearing, an administrative law judge (ALJ) issued a 19–page opinion dismissing the complaint. Defendant appealed to the Postal Service Judicial Officer, who, in an opinion dated November 7, 1986, reversed the ALJ. The Judicial Officer ruled that the solicitations could reasonably be construed as bills or invoices, in violation of 39 U.S.C. § 3001(d), and that they in fact made the false representations alleged, in violation of 39 U.S.C. § 3005. Accordingly, he entered orders prohibiting the delivery to UCIS of all mail concerning the applications, and directing plaintiffs to cease and desist from further violations of §§ 3001(d) and 3005.

Upon receipt of the Judicial Officer's decision, plaintiffs filed this action on November 14, 1986, and applied for temporary injunctive relief. At the suggestion of the Court, the parties agreed to an expedited briefing schedule and a single hearing on the merits of their respective claims. That hearing was held on December 4, 1986. For the reasons set forth below, the Court grants plaintiffs' motion for summary judgment.

I

■ The central issue in this case is whether the Judicial Officer's determination that plaintiffs' solicitations could reasonably be construed as invoices or bills is supported by substantial evidence. The standard of review in a case such as this is well established. This Court "must determine whether on the basis of all the testimony and exhibits before the agency it could fairly and reasonably find the facts as it did." *Braniff Airways, Inc. v. CAB*, 379 F.2d 453, 462 (D.C.Cir.1967). The Court is to look at the entire record and must consider contrary evidence as well as that supporting the agency's decision. Of course, an agency decision can pass muster under the substantial evidence test notwithstanding the existence of conflicting evidence or the possibility that different conclusions might be drawn from that evidence. *Id.* at 463. On the other hand, the Court need not "accept meekly 'administrative pronouncements clearly at variance with established facts.'" *Id.* (quoting *NLRB v. Morganton Full Fashioned Hosiery Co.*, 241 F.2d 913, 916 (4th Cir.1957)).

■ The question before both the ALJ and the Judicial Officer was whether plaintiffs' solicitation "is in the form of, and reasonably could be interpreted or construed as, a bill, invoice, or statement of account due," within the meaning of 39 U.S.C. § 3001(d). Advertisements and other forms of solicitations judged under this statutory test must be viewed in their totality; courts, and in the first instance the Postal Service, must consider the effect the solicitation would most probably produce on ordinary minds. *Donaldson v. Read*

*Magazine,* 333 U.S. 178, 189, 68 S.Ct. 591, 597, 92 L.Ed. 628 (1948). Advertisements should not be assessed with a lawyer's eye to fine spun distinctions, but rather with a view to the overall impression they will make on the average reader. *American Image Corp. v. United States Postal Service,* 370 F.Supp. 964, 966 (S.D.N.Y.1974). In this case, of course, the parties are agreed that the "average reader" of plaintiff's solicitations are not household consumers but rather businesses, particularly the bookkeepers and accountants within those businesses.

The ALJ heard testimony over the course of a three-day hearing from plaintiff Jeffrey Rayden and plaintiffs' expert witness Dr. John Parkington, an expert in direct-mail marketing and survey research. Defendant proffered the testimony of Larry Johnson, the Postal Inspector who investigated the complaints; Dr. Paul Scipione, an expert in consumer psychology; and nine "victim" witnesses. The ALJ also had before him the solicitation itself, the customer complaints, and a study prepared by Dr. Scipione, which the judge ultimately ruled inadmissible. In dismissing defendant's complaint, the ALJ found that even to the most casual observer the mailing does not look like an invoice or bill and that defendant's contrary assertion rested on relatively insignificant features of the solicitation. Initial Decision of Administrative Law Judge Quentin Grant (April 25, 1985) ("ID") at 17. He further found that the victim testimony was so vague and inconclusive as to be "almost devoid of probative value;" *id.* at 18; that even defendant's expert, Dr. Scipione, had failed to state affirmatively that the solicitation would be likely to induce mistaken payment by recipients, *id.;* and finally, that defendant's characterization of the complaints rested on a series of assumptions that proved, upon closer examination, to be at best questionable and in some instances wrong. *Id.* at 18–19.

In reversing, the Judicial Officer conducted an independent review of the record and concluded that the mailing creates the overall impression that it is a bill or invoice.

*United Commercial Insurance Services,* P.S. Docket No. 19/18 (PSD Nov. 7, 1986) ("PSD") at 9. This conclusion, he found, was buttressed by the testimony of Dr. Scipione and the victim witnesses; the survey prepared by Scipione; and the complaints received by the Postal Service.

## II

■ The parties, the ALJ, and the Judicial Officer are all in agreement on one point: the most telling evidence of whether a mailing can reasonably be construed as an invoice is the mailing itself. *Telex & tws Directory,* P.S. Docket No. 13/6 (PSD April 1, 1983). The solicitation at issue here comes in a small computer-printed envelope that is opened by tearing off a perforated stub and peeling off the cover. Inside are two sheets, printed front and back, that are approximately the size of a standard credit card charge slip or receipt. The first page bears the registered trademark name "Checkwriter Insurance" in bold, italicized print across the top of the sheet. In approximately the center of the page, in bold capital letters, is the word "APPLICATION." Beneath this, plaintiffs' services are described as follows:

COVERAGE–Checkwriting System of Check Protection

A—$15,000 FORGERY AND CHECK ALTERATION INSURANCE

B—MECHANICAL SERVICE CONTRACT

A box with the recipient's name and address lies beneath this description, and next to it on the right is a smaller box captioned "AMOUNT" which shows the price in computer type. At the bottom of the page is a box which provides for the recipient's signature underneath the following: "I accept your offer and hereby apply for the checkwriter insurance and mechanical service contract program. I represent the underwriting information on the reverse side to be true and correct." The right-hand portion of the page is a tear-off stub that the recipient is advised to "Retain ... with your insurance records." A six-digit con-

tract code or number is given, followed by three boxes captioned "Months," "Amount" and "Offer Effective." On the back of the first page is the application itself. It is captioned, in bold, capital letters, "APPLICATION," and directs recipients to answer four questions. A reminder at the bottom of the page states "Return this portion with payment to apply."

The first side of the second sheet sets forth the so-called "sell" of the solicitation, providing a description of plaintiffs' services and comparing them to those of its competitors. At the bottom of this page, again in bold letters, is the direction: "Mail your check with the enclosed application today or call our toll-free number, 800 423–3125 for fastest service." The back of the second sheet offers additional details about plaintiffs' services, again prominently displaying the toll-free customer service number.

As plaintiffs point out, the solicitation uses the words "Application," "applicant," and "apply" 15 times. The word "application" appears in bold, capital letters on both the front and back sides of the first page, in the largest typeface used on these two sides; the word "offer" appears twice on the front of the first page. The liberal and prominent use of these words, which are completely inconsistent with an invoice or demand for payment, led the ALJ to conclude that "even to the most casual observer this solicitation does not look like an invoice or bill." ID at 17. The other features which the ALJ believed clearly distinguished the mailing from a bill were: (1) the prominent explanation of plaintiffs' services; (2) the full-page comparison of those services with those of a competitor; (3) the use of two-toned shading to highlight certain information; (4) the request for answers to underwriting questions; and (5) the box for an acceptance signature at the bottom of the first page. *Id.* To these this Court might add the fact that the solicitation provides on three of its four sides, a toll-free 800 number, which is typical of advertisements; that the mailing includes a "franked" or prepaid return envelope, again typical of solicitations and

quite unusual for bills or invoices; and that the mailing explains on the backs of both pages that the coverage becomes effective as of 12:00 noon on the date following the postmark of the return envelope, an explanation at odds with the suggestion of an existing relationship.

Despite all these indicia of solicitation, the Judicial Officer determined that the mailing conveys the overall impression that it is a bill or invoice. This conclusion is seriously flawed in several respects, and is at variance with readily apparent facts. The Judicial Officer relied primarily on the fact that the mailing comes in a small, computer-printed envelope; is small and drab in appearance; does not attempt to sell the services on the first of the two sheets; contains the typed-in name of the addressee, the specific dollar amount, and what appears to be a contract number; and includes a tear-off stub for the recipient's records. *See* PSD at 9. Even defendant's expert, however, did not state that these features convey "the overall impression" that the mailing is a bill; in fact, Dr. Scipione did not even characterize these features as common or typical of invoices, but rather as "unusual" for direct mail pieces. Transcript of Hearing ("Tr.") at 151–54. Furthermore, he indicated that while these unusual characteristics "might tend to communicate or telegraph to [recipients] that what they are receiving is an invoice or a bill.... there are other elements in the communication that would tend to counterbalance that and lead to a consumer assumption that this ... is an ad, a direct mail piece." *Id.* at 148–49. Most importantly, as the ALJ pointed out, Dr. Scipione "did not give a positive, affirmative response to the question whether the ... solicitation would be likely to induce payment in the mistaken belief that it is a bill." ID at 18.

At best, Dr. Scipione's testimony demonstrates not that the mailing conveys an overall impression that it is a bill or that it could reasonably be construed as such, but that certain of its elements are not typical of solicitations and might *suggest* that the

mailing is a bill. But even this rather equivocal assertion is seriously undermined by the fact that Dr. Scipione's testimony is inconsistent with certain statements he made in his own survey, as well as with the Postal Service's characterization of similar mailings. Thus, the Response Analysis Corporation (RAC) survey which Dr. Scipione helped author[1] states that window envelopes rather than computer-printed envelopes are associated with bills; that the mailing at issue is not the standard size of invoices, but smaller; that the mailing is not drab but "somewhat attractive/professional" and in color; that the presence of a tear-off stub has little statistical significance; and that the fact that a mailing has more than one page indicates it is a solicitation. In addition, mailings by American Express and Wells Fargo Bank, which the Postal Service views as unobjectionable solicitations, share several of the "unusual" features of plaintiffs' mailings identified by Dr. Scipione and relied upon by the Judicial Officer—they are sent in computer-printed envelopes, are drab in appearance, do not attempt to sell their services on the first page, and display contract numbers and the recipient's name and address in computer type. Neither Dr. Scipione nor the Judicial Officer attempted to distinguish these legitimate mailings from plaintiffs', and more importantly, the Judicial Officer failed to explain how these features in plaintiffs' mailing could convey the overall impression of an invoice and yet be permissible in other mailings.

Even putting aside the serious weaknesses in Dr. Scipione's equivocal testimony, the Judicial Officer offers no reasoned explanation for his assertion that because of the overall impression created by the mailing's unusual features, "many recipients would fail to notice or understand the import of the word 'APPLICATION,' which appears in bold type, or the 'I accept your offer and hereby apply ...' language appearing in small print at the bottom of the page." PSD at 9. It is inconceivable that the mailing's more subtle attributes, such as the size of the envelope or the tear-off stub, would blind recipients to its most prominent feature—the word "APPLICATION," which is displayed on both the front and back of the first sheet in the largest and boldest type. This is not a case where claims, promises or demands are highlighted and qualifications or disclaimers are buried in the fine print; on the contrary, the qualifying, or perhaps more accurately the clarifying, language of the mailing is prominently featured. Nor is the impact of this language likely to be lost on recipients, particularly as the words "application," "applicant," "apply," and "offer" appear no less than 17 times. It does not take a lawyer's eye for fine distinctions to recognize the import of this language, and only the most patronizing of attitudes towards the class of readers involved here—i.e., businesspersons and, in particular, bookkeepers and accountants—would treat them as incapable of understanding such language.

It is revealing that in reaching his contrary conclusion, the Judicial Officer dismissed plaintiffs' use of the word "APPLICATION" as "not a satisfactory substitute for the statutory or regulatory language which is intended to clearly and unambiguously place the ordinary recipient on notice that a solicitation is not a bill, invoice, or statement of account due." *Id.* at 9–10.[2] This statement indicates that the

---

**1.** The study, "Solicitations in the Guise of Invoices: The Experience, Attitudes and Perceptions of U.S. Businesspersons," was commissioned by defendant from RAC, a Princeton, New Jersey corporation. Dr. Scipione is a vice-president of RAC and one of the study authors. The study was introduced through his testimony, but the ALJ ultimately concluded that it was so seriously flawed as to be inadmissible. ID at 5–7. Whether admissible or not, however, the study is relevant to assessing Dr. Scipione's consistency as a witness.

**2.** Section 3001(d) provides that solicitations which can reasonably be construed as invoices are nonmailable unless they bear, in appropriate typeface and size, the following:

"This is a solicitation for the order of goods or services or both, and not a bill, invoice, or statement of account due. You are under no

Judicial Officer employed a presumption such that any solicitation, if ambiguous, is deemed impermissible unless it contains a statutory disclaimer. Indeed, the Judicial Officer went so far as to state that "[t]he simple cure for an ambiguous solicitation in the guise of a bill or invoice is the inclusion of the statutory or regulatory disclaimer. Since the solicitations do not contain the requisite disclaimer, they constitute non-mailable matters under 39 U.S.C. § 3001(d)." *Id.* at 11. The statute itself, however, creates no such presumption, nor does it permit the Postal Service to prohibit the mailing of certain material simply upon a showing that the material is "ambiguous." The test is whether the solicitation could *reasonably* be construed as a bill or invoice. To the extent the Judicial Officer applied a different standard—one turning on a solicitation's ambiguity—and dismissed the solicitation's clarifications as presumptively inferior to defendant's, his decision is not supported by substantial evidence.

In addition to Dr. Scipione's testimony and his own assessment of the solicitation, the Judicial Officer rested his decision on the "victim" witness testimony, the customer complaints, and the RAC survey. The extent of his reliance on this evidence is not entirely clear, as the decision makes but passing reference to most of it, but even this evidence lends little if any support to his conclusion that plaintiffs' solicitation is nonmailable.

At least with respect to the survey, the Judicial Officer appears to acknowledge as much. While the Judicial Officer overruled the ALJ's determination that the survey was inadmissible, he recognized that the

study's flaws rendered its statistical projections useless and its conclusions merely "supportive of the more persuasive evidence" offered by defendant. *Id.* at 7. Without belaboring its deficiencies [3] or passing judgment on its admissibility, the Court finds that the survey offers virtually no evidence in support of the proposition that plaintiffs' mailing could reasonably be construed as an invoice. While thirty-three percent of the accountants interviewed for the study responded that, at least initially, they thought the mailing was either "definitely" or "probably a bill," testimony before the ALJ revealed that upon a second inspection, many of these interviewees recognized that their initial impression was incorrect.[4] Furthermore, many of the interviewees whose initial responses were included in the "definitely" or "probably a bill" category demonstrated from their written comments that they knew all along that the mailing was not a bill. Thus, for example, one interviewee who categorized the mailing as a bill wrote, "[i]t looks like most ads I get," Tr. at 519; another commented, "I see the words … application and offer, good on a certain date. I see it's definitely not a bill," *id.* at 520; several others wrote that it was a bill *only if* they wanted the service being offered, *id.* at 520, 527; still another indicated that it was definitely a bill, yet placed it in a pile for junk mail. *Id.* at 527–28.[5] A frequently repeated comment was that the interviewees normally knew the firms with which they did business, and would immediately know whether the mailing was from a company that billed them. In addition, as the ALJ pointed out, 90 percent of the interviewees stated that in their employment

---

obligation to make any payments on account of this offer unless you accept this offer."
39 U.S.C. § 3001(d).

**3.** These are catalogued in the ALJ's decision. *See* ID at 5–7. Perhaps the most serious flaw was that the Postal Service revealed to RAC the purpose for which the survey was prepared—*i.e.* for use in upcoming mail fraud prosecutions.

**4.** Several interviewees characterized the mailing as a bill before they actually opened the envelope. *See* Tr. at 517. Their second "inspec-

tion," therefore simply consisted of reading the mailing itself.

**5.** It is also worth noting that the interviewees were asked to categorize the mailing in one of four ways—"definitely a bill," "probably a bill," "probably not a bill," or "definitely not a bill." Each response used the word "bill," and interviewees were not given the option of labelling the mailing a solicitation. This slanted orientation was yet another reason the ALJ found the survey inadmissible. *See* ID at 6.

they would not make payment or otherwise act on the basis of their impressions of a mailing, thus seriously undermining one of the study's major premises: that a recipient's initial impression is crucial to whether the mailing is treated as a bill and ultimately paid.

Not only do these various comments undermine whatever statistical significance the study otherwise might have had, they highlight a fundamental flaw in defendant's theory of this case. Before this Court, the Postal Service argued that plaintiffs' mailing was objectionable, and indeed somewhat insidious, because it preyed on business carelessness through its subtle similarities to invoices. The survey comments, however, reveal that carelessness is neither the norm nor the hallmark of an accounting office. Moreover, the propensity to confuse or mislead the *careless* is not the standard by which mailings are to be judged under section 3001(d). The statute is designed to protect those who might *reasonably* construe a solicitation as a bill. That plaintiffs' mailing might mislead the careless, while regrettable, does not make it nonmailable.

The testimony of the so-called "victim" witnesses likewise provides no support either for defendant's contentions or the Judicial Officer's decision. The ALJ, who had the benefit of seeing and hearing these witnesses, summarized the testimony of each and concluded that it was "almost devoid of probative value." ID at 18. He noted that three witnesses represented companies or persons which recognized that the mailing was not a bill; two others represented companies or groups that purchased the coverage after senior officers filled out the applications, then subsequently requested refunds, though not because they were initially deceived or misled; another witness complained about mailings other than the one at issue here; and the remaining three offered second-hand speculation as to how others in their companies may have construed the mailing. *Id.* Most importantly, "[n]ot one of the witnesses testified that he/she reviewed the solicita-tion and authorized, or made, payment in the mistaken belief that it was a bill." *Id.*

Finally, the complaints received by defendant are, like the survey, largely inconclusive and therefore lacking in probative value. Before the ALJ, the parties entered into a stipulation which summarized the approximately 1,000 complaints received by the Postal Service. Slightly better than half of those who complained did so not because they misconstrued the solicitation, but because they believed others might; only one percent, or twelve persons, wrote that they believed that the solicitation was a bill and actually paid it. Approximately 30 percent of those who mailed in complaints did so either without explanation or with terse comments, such as "fraud" or "illegal," that failed to disclose whether the writer had actually been deceived by the solicitation itself. *See id.* at 16. On appeal, the Judicial Officer dismissed this statistical break-down without explanation. He found that the complaints provided persuasive support for his conclusion that the solicitation could reasonably be construed as an invoice, and stated that the "parties' summaries of these complaints which appear to have been relied upon by the [ALJ] do not accurately portray the number or content of the complaints." PSD at 10. Such unsubstantiated assertions are, as plaintiffs argue, the antithesis of reasoned decisionmaking and are certainly not entitled to deference from a reviewing court examining a decision under the substantial evidence test.

Moreover, while defendant quotes the Judicial Officer's rejection of the complaint summary with approval, it offers no explanation as to why it stipulated to that summary in the first instance, or why it is no longer bound by its stipulation. Defendant now argues that 66 percent of those who complained thought the mailings looked like a bill, and that 95 persons, or approximately ten percent of those complaining, mistakenly made payment. Neither of these assertions, however, provides substantial support for the Judicial Officer's rejection of the stipulated summary or, more importantly, for his ultimate conclu-

sion. The fact that two-thirds of all complainants thought the solicitation looked like a bill is in no way inconsistent with the ALJ's finding that one-half of all complainants recognized the mailing as a solicitation but thought others might misconstrue it; indeed it is inconceivable that anyone would worry that others might be misled unless the solicitation bore some resemblance to an invoice. Nor does the fact that 95 people rather than 12 people mistakenly made payment undermine the ALJ's conclusion that the number of such mistaken payments "is miniscule both in absolute and percentage terms." ID at 19. Plaintiffs have mailed in excess of 40 *million* solicitations since 1977. The total number of complaints therefore represents only .0025 percent of the number of applications mailed, and the total number of mistaken payments, even accepting defendant's figure of 95, represents only .00024 percent of all recipients. Put another way, the complaints reveal that only one person in every 42,105 has misconstrued the solicitation and mistakenly paid it believing that it was an invoice. Far from providing substantial evidence for the Judicial Officer's conclusion, therefore, the complaints demonstrate that those who construed the solicitation as a bill did so unreasonably.

### III

Section 3001(d) is designed to protect the public from solicitations which can reasonably be construed as bills or invoices and thereby induce mistaken payment. While the statute protects the innocent and gullible as well as the sophisticated, it does not impose strict liability on solicitors for the carelessness of those they solicit. Here plaintiffs' mailing plainly declares itself an application and reinforces that message throughout its four printed pages. The Judicial Officer, however, seized upon the mailing's more subtle features and ascribed to them a significance they do not merit, while at the same time dismissing the solicitation's dominant characteristics as presumptively inferior to certain regulatory disclaimers. Having thus characterized the mailing as impermissibly misleading, he found further support for his conclusion in certain testimony, studies and statistics which, upon close examination, turn out to be equivocal at best, and at their worst, either largely devoid of any probative value or contrary to his determination. In short, the Judicial Officer's conclusion that plaintiffs' mailing can reasonably be construed as an invoice or bill is not supported by substantial evidence and must be set aside. Likewise, his determination that the solicitation contains three false representations—a determination that "necessarily follow[ed] from the finding that the solicitation ... reasonably could be interpreted or construed as a bill," PSD at 11—must also be set aside. Accordingly, summary judgment will be entered in favor of plaintiffs and against defendant.

It is, therefore, this 18th day of December, 1986,

ORDERED that judgment be and it hereby is entered in favor of plaintiffs Jeffrey Rayden, Burton Rayden and United Commercial Insurance Services, and against defendant United States Postal Service; and it is

FURTHER ORDERED that the decision of the Judicial Officer set out at P.S. Docket No. 19/18 (PSD Nov. 7, 1986) be and it hereby is reversed with instructions to defendant to immediately rescind its order prohibiting the delivery of mail to plaintiff United Commercial Insurance Services and to immediately rescind its cease and desist order. For reasons fully set forth in this Opinion, there shall be no stay of this Order and Judgment.