ORIGINAL COSMETICS PRODUCTS, INC. and Love Song Cosmetic Corp., Plaintiffs,

v.

John STRACHAN, Postmaster at New York City, New York, and United States Postal Service, Defendants.

No. 76 Civ. 4111 (LBS).

United States District Court, S. D. New York.

Aug. 10, 1978.

Herbert M. Levy, New York City, for plaintiffs.

Robert B. Fiske, Jr., U. S. Atty., S.D. N.Y., New York City, for defendants; Patrick H. Barth, Asst. U. S. Atty., New York City, of counsel.

## MEMORANDUM and ORDER

SAND, District Judge.

Pursuant to 28 U.S.C. Section 636(b)(1), this Court is called upon to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made" with respect to the recommendations of Magistrate Sol Schreiber that defendants' motion for summary judgment be granted.

As set forth in detail in the Magistrate's Recommendation (attached hereto), in November, 1975, the Postal Service instituted an administrative proceeding charging that plaintiffs' advertising was materially false for the following products:

Song of Passion Tablets, Super Ginseng Tablets, Spanish Fly Imitation, Ginseng and Imitation Spanish Fly, Jungle Passion Caps, All American Booster Caps with Vit. E, Authentic Turnera Aphrodisiaca Caps, Drive Her Wild, and Instant Erection Oil.

An administrative decision found that the plaintiffs have been engaged in a scheme to obtain money through the mails by means of false representations in violation of 39 U.S.C. Section 3005. An Order was issued prohibiting delivery of mail to, and payment of Postal Money Orders in favor of, plaintiffs with respect to the above products.

Plaintiffs appealed unsuccessfully from the decision of the administrative law judge to the Judicial Officer of the Postal Service and, having thus exhausted their administrative remedies, commenced this action. Both parties moved for summary judgment, Fed.R.Civ.P. 56; by Order dated September 23, 1977 of the Honorable Gerard L. Goettel, District Judge (from whom this case was reassigned to the undersigned), the case was referred to Magistrate Schreiber for the purposes of reviewing the administrative record and submitting a report and recommended disposition. On April 25, 1978, after a comprehensive review of the issues presented, Magistrate Schreiber recommended the granting of defendants' motion for summary judgment.

Plaintiffs thereafter filed a thirty-eight page memorandum in opposition to the Magistrate's Recommendation which they describe as "an informal comment rather than a formal brief . . . because we believe it will suit the convenience of the Court, we herein avoid the conventional approach of setting forth the facts and then the legal arguments, but, as does the Magistrate, bunch together the recitation of the evidence and legal argument in regard thereto". (Plaintiffs' Comments, p. 1).

This format lends itself to a somewhat discursive but not uninteresting dissertation on sexuality, aphrodisiacs and placebos. However, after a thorough review of the entire record, the Magistrate's Recommendation and the memoranda submitted by the parties, we conclude that none of plaintiffs' objections have merit.

Plaintiffs begin their contentions by conceding that "the learned Magistrate accurately sets forth the procedural posture and background of this case. Were the facts and issues as stated by the Magistrate, it would be difficult to quarrel with his recommendation. But neither our contentions, the law, nor the facts are as the Magistrate suggests we urged them to be, nor as he finds them to be." (Plaintiffs' Comments, p. 1). We, therefore, examine plaintiffs' specific points to see whether this characterization is sound.

First, plaintiffs urge that the Magistrate dealt only with the issue of facial constitutionality, whereas plaintiffs urged the unconstitutionality of the statute *"as construed and applied"* (emphasis in original). (Plaintiffs' Comments, p. 2). But upon analysis, this contention turns out to be nothing more than a semantic variation of plaintiffs' prime argument that the remedy provisions of 39 U.S.C. Section 3005 are unconstitutional. Plaintiffs base their argument on the Supreme Court's holding in *Blount v. Rizzi*, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971), that parallel administrative procedures contained in 39 U.S.C. Section 4006, which deals with obscenity, were unconstitutional.

This contention, however, is foreclosed by *Lynch v. Blount*, 330 F.Supp. 689, 694 (S.D. N.Y.) aff'd 404 U.S. 1007, 92 S.Ct. 673, 30 L.Ed.2d 656 (1971), where Judge Medina explicitly held:

"We think the safeguards defined in *Blount v. Rizzi*, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971), for obscenity cases are wholly inappropriate, unnecessary and inapplicable to the field of commercial fraud."

Plaintiffs seek to avoid the impact of *Lynch* on two grounds. First, that *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), holding certain commercial advertising protected by the First Amendment, opens to question the continued validity of *Lynch*. But, as the Magistrate noted, in *Virginia State*, the Supreme Court went to some lengths to make clear its view that the First Amendment does not prohibit the State from dealing with deceptive or misleading advertising. 425 U.S. at 770–72, 96 S.Ct. 1817.

Second, in its Reply Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment, plaintiffs seek to distinguish *Lynch* on the grounds that the court there was dealing with "good old-fashioned schemes to defraud" which are "easily recognized". 330 F.Supp. at 695. Plaintiffs urge that when one deals in the area of human sexuality, where the state of our knowledge is far from complete and where new research is being conducted producing new insights and attitudes, different principles should obtain. The Court finds little basis to quarrel with plaintiffs' philosophic discussions concerning the inadvisability of dogmatism with regard to sexuality, but we do find it difficult to distinguish cases dealing with "good old-fashioned schemes to defraud" with the instant case where plaintiffs, among other things, sold common variety red pepper as "Imitation Spanish Fly" for $5.95 per 24 tablet bottle.

We have examined all of plaintiffs' other contentions. Many of them seemingly put forth as separate objections are but variations on plaintiffs' principal themes; others are "quibbles" which either fail to undermine the basic soundness of the Magistrate's conclusions or lack support based on a fair reading of the record.

We have concluded that the Magistrate applied the appropriate standards for review of the administrative decision under challenge and correctly interpreted the applicable law.

It is entirely fitting that governmental action which has consequences as drastic as those which flow from a Post Office stop order and which could potentially impinge upon First Amendment rights be subject to careful scrutiny. We are satisfied that plaintiffs' contentions received full and fair consideration both administratively and before the Magistrate.

The Magistrate's Recommendation is accepted by this Court and summary judgment is granted in favor of defendant.

SO ORDERED.

Appendix to follow.

APPENDIX

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                          :
ORIGINAL COSMETIC PRODUCTS, INC.
and LOVE SONG COSMETIC CORP.,       :

               Plaintiffs,       :       MAGISTRATE'S RECOMMENDATION

     –against--                    :       76 Civ. 4111 (GLG)

JOHN STRACHAN, Postmaster at        :
New York City, New York, and
UNITED STATES POSTAL SERVICE,       :

              Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

By order of the Honorable Gerard L. Goettel, District Judge, this case was referred to the undersigned to review the administrative record on cross motions for summary judgment, Rule 56, Fed.R.Civ.P., which seek review of a U.S. Postal Service ("Stop-Mail") Order issued pursuant to 28 U.S.C. § 1339.

An administrative decision of the U.S. Postal Service found that the plaintiffs have been engaged in a scheme to obtain money through the mails by means of false representations in violation of 39 U.S.C. § 3005 [1] with respect to the sale of the following products:

Song of Passion Tablets, Super Ginseng Tablets, Spanish Fly Imitation, Ginseng and Imitation Spanish Fly, Jungle Passion Caps, All American Booster Caps with Vit. E, Authentic Turnera Aphrodisiaca Caps, Drive Her Wild, and Instant Erection Oil.

The Postal Service alleged the following misrepresentations:

1) Express and implied representation of Song of Passion Tablets, Spanish Fly Imitation, Jungle Passion Caps, and Authentic Turnera Aphrodisiaca Caps as effective aphrodisiacs or sexual stimulants;

2) Express and implied representation of Super Ginseng Tablets as an effective means of increasing and prolonging sexual virility and potency, and of All American Booster Tabs with Vitamin E, as an effective means of increasing sexual virility and performance;

3) Expressly and impliedly represented that Ginseng and Imitation Spanish Fly would effectively heighten and prolong sexual performance, capacity and enjoyment;

4) Expressly and impliedly represented that Drive Her Wild would heighten sexual enjoyment and cause frigid women to engage in sexual intercourse;

---

1. 39 U.S.C. § 3005 provides, pertinently:

[False representations; lotteries]

  (a) Upon evidence satisfactory to the Postal Service that any person is engaged in conducting a scheme or device for obtaining money or property through the mail by means of false representations, . . ., the Postal Service may issue an order which—

  (1) directs the postmaster of the post office at which mail arrives, addressed to such a person or to his representative, to return such mail to the sender appropriately marked as in violation of this section, if the person, or his representative, is first notified and given reasonable opportunity to be present at the receiving post office to survey the mail before the postmaster returns the mail to the sender; and

  (2) forbids the payment by a postmaster to the person or his representative of any money order or postal note drawn to the order of either and provides for the return to the remitter of the sum named in the money order or postal note.

  (b) . . .

5) Expressly and impliedly represented that Instant Erection Oil would instantly and for prolonged periods of time enable a man, who was otherwise unable, to achieve an erection.

As a result of this decision an order was issued pursuant to 39 U.S.C. § 3005 prohibiting delivery of mail to, and payment of Postal Service money orders in favor of, plaintiffs if such mail relates to the sale of the named products.

*Background*

In November 1975, the Postal Service instituted an administrative proceeding charging that plaintiffs' advertisements for the above nine products were materially false.

The administrative hearing began on February 18, 1976, in New York City,[2] where the Postal Service introduced evidentiary exhibits and the testimony of two witnesses: Gene McHale, a postal inspector, and Robert S. Hotchkiss, M.D., head of Urology at New York University School of Medicine. Plaintiffs offered the testimony of Melvin Cooper, the president of plaintiff corporations, and Joseph Davis, M.D., head of Urology at New York Medical College.

Plaintiffs rested their case on March 19, 1976, and on May 4, 1976 applied to re-open the proceedings. The administrative law judge (ALJ) denied this motion and on May 28, 1976 sustained the complaint. Plaintiffs then exhausted their administrative remedies by appealing to the Judicial Officer of the Postal Service, who affirmed the decision.

*Judicial Review*

The questions presented are:

(I) whether there is merit to plaintiffs' contention that 39 U.S.C. § 3005 is unconstitutional;

(II) whether the administrative decision was supported by substantial evidence; and

(III) whether the Postal Service wrongly prejudiced plaintiffs' case by refusing to re-open the hearing for further evidence.

I

Plaintiffs recognize that the constitutionality of 39 U.S.C. § 3005 was upheld in *Lynch v. Blount*, 330 F.Supp. 689 (S.D.N.Y.), aff'd, 404 U.S. 1007, 92 S.Ct. 673, 30 L.Ed.2d 656 (1971). They contend, however, that its constitutionality was newly placed in question as a result of a 1976 decision of the United States Supreme Court, *Va. State Board of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346. They argue that *Va. State* (decided four days prior to the decision of the ALJ), which held that certain commercial advertising is protected by the First Amendment, extends to the false advertising enjoined by 39 U.S.C. § 3005.

This argument fails in that the Court in *Va. State* explicitly states that its opinion does not protect false commercial speech.

In concluding that commercial speech, like other varieties, is protected, we of course do not hold that it can never be regulated in any way. Some forms of commercial speech regulation are surely permissible.

.      .      .      .      .

. . . Untruthful speech, commercial or otherwise, has never been protected for its own sake. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Konigsberg v. State Bar*, 366 U.S. 36, 49, and n.10, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961). Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem. The First Amendment, as we construe it today, does not prohibit the State from insuring that the stream of commercial information flow

2. It was moved to Washington, D.C. following a grant of plaintiffs' December 17, 1975 motion for a change of venue over opposition of the Postal Service. The Washington proceeding took place on March 19, 1976.

cleanly as well as freely. 425 U.S. at 770–72, 96 S.Ct. at 1830 (footnote omitted).

The Court in *Va. State* elaborates, in a footnote, on the issue of false commercial speech.

In concluding that commercial speech enjoys First Amendment protection, we have not held that it is wholly undifferentiable from other forms. There are commonsense differences between speech that does "no more than propose a commercial transaction," *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. [376], at 385, 93 S.Ct. 2553, 37 L.Ed.2d 669, and other varieties. Even if the differences do not justify the conclusion that commercial speech is valueless, and thus subject to complete suppression by the State, they nonetheless suggest that a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired. The truth of commercial speech, for example, may be more easily verifiably by its disseminator than, let us say, news reporting or political commentary, in that ordinarily the advertiser seeks to disseminate information about a specific product or service that he himself provides and presumably knows more about than anyone else. Also, commercial speech may be more durable than other kinds. Since advertising is the *sine qua non* of commercial profits, there is little likelihood of its being chilled by proper regulation and forgone entirely.

Attributes such as these, the greater objectivity and hardiness of commercial speech, may make it less necessary to tolerate inaccurate statements for fear of silencing the speaker. (citations omitted). They may also make it appropriate to require that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive. (citations omitted). 425 U.S. at 771–72 n.24, 96 S.Ct. at 1830.

II

In determining the second issue, this Court notes the standard to be followed in reviewing a Postal Service decision. *See* 5 U.S.C. §§ 704, 706 (1970).

"The power . . . may not be interfered with by the courts unless it has *exceeded its authority or is palpably wrong*, . . . .

"And even though the court, as the original trier of the facts, might have reached a different conclusion, it may not substitute its own judgment if there is *substantial evidence to support the finding of fact made by the [Postal Service]*. Thus the court's power to upset a finding by the [Postal Service] that the mails are being used in furtherance of a fraudulent scheme is restricted to those instances where there is no substantial evidence reasonably to support [its] conclusion",

. . . . .

*See also, Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (". . . the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.") *Unique Ideas, Inc. v. United States Postal Service*, 416 F.Supp. 1142, 1144–45 (S.D.N.Y.1976). (emphasis added).

This Court must decide whether there is substantial evidence that the products to which the "Stop-Mail" Order applies were in fact advertised by means of "false" representations, within the meaning of 39 U.S.C. § 3005.

A primary question is whether these products were represented as being effective aphrodisiacs or sexual stimulants. The next issue is whether, if they were so represented, this representation was false.

Plaintiffs contend that as parts of the advertisements in issue included the words "legendary aphrodisiacs", "so called aphrodisiacs" and "legendary aphrodisiacs with the placebo qualities doctors have used for

years", the products were not being represented as *actual* aphrodisiacs.[3]

In reviewing the circulars in question, this Court is guided by the established legal precept that "[q]uestions of fraud may be determined in the light of the effect advertisements would most probably produce on ordinary minds." *Donaldson, Postmaster General v. Read Magazine, Inc.*, 333 U.S. 178, 189, 68 S.Ct. 591, 597, 92 L.Ed. 628 (1948).

The Court is concerned with the ultimate impression upon the potential consumer "not only from the total of what is stated but also from what is reasonably implied." *N. Van Dyne Advertising Agency, Inc. v. United States Postal Service*, 371 F.Supp. 1373, 1376 (S.D.N.Y.1974).

The advertisements in issue convey the overall impression that the products are not merely legendary aphrodisiacs or placebos. Although isolated passages within the ads appear to mitigate the averments that the products are actually aphrodisiacs, they do not effectively dispel the general impression that the product will aid the buyer's sex life.

It is no defense that specific isolated portions of the advertisement might have been true.

"It is not each separate word or a clause here and there of an advertisement which determines its force, but the totality of its contents and the impression of the entire advertisement upon the populace . . ."

"[E]ven if an advertisement is so worded as not to make an express misrepresentation, nevertheless, if it is artfully designed to mislead those responding to it, the mail fraud statutes are applicable." *Borg-Johnson Electronics, Inc. v. Christenberry*, 169 F.Supp. 746, 750–51 (S.D.N.Y.1959).

An example of the artful construction of these advertisements is found in the representations concerning "JUNGLE PASSION CAPS"—"A combination of rufous copsicum annum, damiana and serenoa serrulata designed to bring out the 'Beast in You'. Students of Aphrodisiacs could write volumes about this product. . . ." The more sophisticated reader would note the less obvious language at page bottom, "All items on this sheet sold as novelties only", and page top, "More legendary aphrodisiacs with the placebo qualities doctors have used for years". But the "Stop Mail" Statute was not designed solely for the cynical or cautious.

In the instance of the mail fraud law, if the evidence establishes that the scheme is directed toward the gullible and the simple, the protection of the statute is not to be denied them even though they do not reach the level of the "ordinary mind." The purpose of the statute is to protect the unwary and unsuspecting as well as the knowledgeable and wordly-wise—those who are "trusting as well as the suspicious". The public includes " 'that vast multitude . . . the ignorant, the unthinking and the credulous.' " The fact that informed and sophisticated persons would readily recognize, laugh off, or even be amused by, obviously false and absurd statements in an advertisement does not detract from their power to deceive the ignorant, gullible and less experienced. *Gottlieb v. Schaffer*, 141 F.Supp. 7, 16 (S.D.N.Y. 1956) (footnotes omitted).

Although certain portions of these advertisements seem to be of an equivocal or puffing nature,[4] the total message to the reader is that the advertised products will increase one's sexual desire and prowess. For example, in boldest type in one of the ads is the following:

---

**3.** "Aphrodisiac" is defined in The Random House Dictionary (unabridged ed. 1967) as
  1. arousing sexual desire—n.
  2. an aphrodisiac agent, as a drug.

**4.** "This is not to say that stop orders will be upheld by the courts whenever a person has resorted to a little exaggeration or mere puffing. The false statement must be material and it must be substantial to warrant the imposition of this drastic remedy." *Lynch v. Blount*, 330 F.Supp. 689, 693 (S.D.N.Y.1971), *aff'd*, 404 U.S. 1007, 92 S.Ct. 673, 30 L.Ed.2d 656 (1972).

"Love Song products—an exciting supercharged sex life requires a full power body. For your sexual pleasure here's a fabulous new line of pleasure packed marital aids, aphrodisiacs and stimulants to turn you on and on and on!!!" (exh. C–1(c)).

Having concluded that substantial evidence supports the allegation that plaintiffs advertised their products as effective sexual stimulants or aphrodisiacs, one must next consider an issue which has prompted considerable historic controversy and curiosity: whether offering these products for sale as aphrodisiacs constitutes making a false representation (within the meaning of 39 U.S.C. § 3005.).

Both sides offered highly qualified expert testimony on the issue of whether the ingredients in the subject products have aphrodisiac properties. One of plaintiffs' arguments is that since both sides agreed (Tr. F. 117; M. 18)[a] that a product's effectiveness could not be determined without double blind testing, which was not done here, the "Stop-Mail" Statute was unconstitutionally applied. Dr. Davis testified that experimentation was necessary because the products might be shown to be effective sexual stimulants. (Tr. M. 10, 13, 18–22).

However, experimentation was not a *sine qua non* for a finding by the ALJ in this case. In *Reilly v. Pinkus*, 338 U.S. 269, 274, 70 S.Ct. 110, 94 L.Ed. 63 (1949), it was held that the testimony of a government expert could rest on his professional knowledge. The Court there considered the contention that a prior decision, relied upon by plaintiffs here, rendered expert testimony incompetent in any case where there was a failure to test the products.

We do not understand or accept it [the *McAnnulty*[b] holding] as prescribing an inexorable rule that automatically bars reliance of the fact-finding tribunal upon informed medical judgment every time medical witnesses can be produced who blindly adhere to a curative technique thoroughly discredited by reliable scientific experiences. But we do accept the *McAnnulty* decision as a wholesome limitation upon findings of fraud under the mail statutes when the charges concern medical practices in fields where knowledge has not yet been crystallized in the crucible of experience. For in the science of medicine, as in other sciences, experimentation is the spur of progress. It would amount to condemnation of new ideas without a trial to give the Postmaster General power to condemn new ideas as fraudulent solely because some cling to traditional opinions with unquestioning tenacity. *Id.* at 274, 70 S.Ct. at 113.

The clear reference to "new ideas" and "fields where knowledge has not yet been crystalized in the crucible of experience" renders the *McAnnulty* rationale inapplicable to this case. As the expert testimony indicated, the substances in question have been considered by medical and pharmacological texts since as early as 1907 (Tr. F. 29, 30, 32–34, 71, 90, 92, 98, 101; M. 17, 31–32). The evidence indicates sufficient exploration of the sexual stimulus value of these ingredients to take it out of the area of "new ideas" contemplated by *McAnnulty* and *Reilly*.

A further reading of *Reilly* demonstrates that the postal order issued in the case at bar is justified in the face of conflicting medical testimony on the issue.

In this case there is conflict, though slight, as to whether kelp or iodine is valueless as a weight reducer. But even if we assume that medical opinion is yet in a state of flux on this question, we think that there was sufficient evidence to support the findings that the efficacy of the "Reducing Plan" as a whole was misrepresented in respondent's advertising. And we think those misrepresentations went beyond permissible "puffing" of a seller's wares; they were material representations on which credulous per-

---

a. "F". refers to the February Transcript and "M". to the March Transcript.

b. *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902).

sons, eager to reduce, were entitled to rely. Despite subtle qualifying phrases it is difficult to read these advertisements as a whole without receiving the impression that contrary to facts justifiably found by the Postmaster General, kelp is a sure and drastic weight reducer; that a user can reduce without uncomfortably restricting his usual ample diet of fattening foods; that the treatment is absolutely safe and harmless to all ages, to the ill and the well.

See *Donaldson v. Read Magazine*, 333 U.S. 178, 188–189, 68 S.Ct. 591, 92 L.Ed. 628. These representations, if made with intent to deceive,[c] fall squarely within the type which in *Leach v. Carlile*, 258 U.S. 138, 42 S.Ct. 227, 66 L.Ed. 511, were held to justify findings of fraud. *Id.* at 274–75, 70 S.Ct. at 113.

Notwithstanding the evidence of the exploration of the efficacy of plaintiffs' products in noted texts used by experts in the urological field, Dr. Davis testified that experimentation was necessary here because science has acquired new techniques within the last ten years which may better determine whether such products actually have any sexual value.[5]

However, although Dr. Davis' suggestion has merit, experimentation was not an absolute prerequisite to an ALJ determination in this case.

c. It has been held that a finding of *scienter* is unnecessary for 39 U.S.C. § 3005 purposes. See *Lynch v. Blount, supra.*

5. Q. * * * The fact that there is no reputable scientific literature that you could find in favor of any of these products as affecting sexuality does not indicate to you that they have no value?

A. It does not indicate to me that they might still—they might still have value if appropriate studies were done that have not been done.

Q. By and large, these are all substances which have been with us for generations or centuries, isn't that true?

A. Yes, sir.

Q. And the matter of sexual capacity or performance has been of concern to medical science for a number of years, at least since before Freud, is that not true?

A. Yes, sir. May I elaborate on my answer to that?

The contention seems to be that even the testimony of the most experienced medical experts can never rise above a mere "opinion" unless the expert has made actual tests of the drug to determine its effects in relation to the particular representations alleged to be false. The *McAnnulty* holding did not go so far. *Reilly, supra*, at 274, 70 S.Ct. at 113.

Both physicians' opinions rested on their general professional knowledge. Dr. Hotchkiss relied on an established body of medical and pharmacological literature (*e. g.*, U.S. Dispensary, U.S. Pharmacopoeia) in concluding that plaintiffs' products were incapable of effecting the claimed results. The doctor's treatment of over 2,000 patients over 40 years for sexual dysfunctions contributed to his firm opinion. (Tr. F. 20, 23).

Opinions of experts when founded upon known scientific facts are not to be considered the same as opinions of laymen, but are considered by the courts as substantive evidence. *Research Laboratories, Inc. v. United States*, 167 F.2d 410, 416 (9th Cir. 1948).

Dr. Hotchkiss' reliance upon well-known medical and pharmacological texts certainly falls within the category of "known scientific facts." The ALJ was thus within his discretion in affording this testimony more

JUDGE GRANT: Yes.

THE WITNESS: But it is only within the past 10 years that we are gaining information about the effects of the diurnal variations in testosterone and other chemicals which have profound effect on the sexual organs. It is only within this period of time that we are beginning to have a chemical understanding—well, not so much a chemical understanding, but an understanding of the physiologic variations in hormonal function which go on during the day and at night, in particular individuals. And, by, for example, studying agents like this, on the basis of these chemical determinations, for example, this might be a way of determining whether they work or not. I mean, we just do not know. So now science has available techniques possibly to study agents like this. (Tr. M. 49–50).

weight than that afforded Dr. Davis' expert evidence.

Dr. Hotchkiss testified that none of the ingredients in plaintiffs' products were, as marketed,[6] in and of themselves,[7] effective sexual stimulants. (passiflora, rufous capsicum annum Tr. F. 25–26, 31–32; ginseng Tr. 30; damiana, serenoa serrulata Tr. 34–35; caffeine, ascorbic acid, Vitamins A and E Tr. 42–45; methyl salicylate Tr. 47–50). He noted that there was no valuable aphrodisiac for patients without organically caused sexual problems (Tr. F. 25); that the ingredients in the products at issue were not used in the medical profession [8] (Tr. F. 25–27); that the 1907 edition of the U.S. Dispensary, 19th ed., stated that ginseng pasnas was not employed as a medicine here and the 1974 edition stated that it was rarely so employed; that the 1973 U.S. Dispensary and British Pharmacopoeia deleted all reference to ginseng (Tr. F. 29–30); that Ginseng and Imitation Spanish Fly (red pepper) had no effect on sexual activity (Tr. F. 32); that the damiana in Jungle Passion Caps (red pepper, damiana, serenoa serrulata) was deemed to be of no value except as a feeble tonic (Tr. F. 34) in the 1907 U.S. Dispensary; that the 1947 U.S. Dispensary states that there is no convincing evidence of its remedial value, it is never currently prescribed by physicians, and is now deleted from modern pharmacologies; that serenoa serrulata was deleted from the U.S. Dispensary after 1947 (Tr. F. 34–35); that passiflora was considered to be of doubtful value in the 1907 U.S. Dispensary; that the 1907 U.S. Dispensary states that definite knowledge of the nature of its active principle is lacking (Tr. F. 90–92); and that the 1975 ed. of the U.S. Pharmacopoeia doesn't list passiflora at all.

Although Dr. Davis testified that the products might well have an aphrodisiac effect because, for example, some irritated the urinary tract (Tr. M. 7, 17), he relied on scant textual evidence (Tr. M. 15–17, 32). His testimony indicated that he did not know whether many of the representations were medically true or false (Tr. M. 11) and that experimentation may have been enlightening. (Tr. M. 17–18, 22, 49). Had Dr. Davis indicated his reliance on treatises of a caliber of that relied on by Dr. Hotchkiss, there may have been more of a question as to whether the ALJ determination was supported by substantial evidence. Plaintiffs failed to controvert or undermine the substantial evidence supporting the ALJ deci-

---

**6.** Dr. Hotchkiss testified that although caffeine was a stimulant, the dosage in All American Booster Caps was too weak to effect any sexual stimulus, (Tr. F. 44, 78). Plaintiffs contend that Dr. Hotchkiss failed to recognize that the recommended dosage was 3 pills daily, which they contend, and Dr. Davis indicated, would have a stimulating effect. While this Court recognizes that there is some merit to plaintiffs' argument, in *Leach v. Carlile,* 258 U.S. 138, 42 S.Ct. 227, 66 L.Ed. 511, the Court held that a difference of opinion as to whether a product had any value at all did not bar a stop-mail order based on claims of far greater curative powers than the product could actually have. See *Reilly, supra,* 338 U.S. at 273, 70 S.Ct. 110. Certainly plaintiffs' ad for the caffeine-containing product bespeaks far greater sexual stimulus value than it could actually have, based on Dr. Hotchkiss' testimony.

**7.** Dr. Hotchkiss testified that application of the methyl salicylate in Drive Her Wild Cream and Instant Erection Oil would probably induce some sexual excitement, but as a result of the tactile sensation rather than its inherent potency. (Tr. F. 79–90).

As for Vitamins C, A and E, Dr. Hotchkiss indicated that one suffering from a deficiency of these vitamins might be incidentally helped in his sex life (Tr. F. 45, 76–77). However, Dr. Hotchkiss testified that the representations were false in that they purported to sell aphrodisiacs for the general population, which the doctor said do not exist. (Tr. F. 118–19). Indeed, Dr. Davis testified that he has to examine individuals with "sexual incapacity" to determine whether they suffer from a physiological or organic condition before determining whether to prescribe any specific drug as an aphrodisiac. He testified that he had never prescribed any of the substances in this case to increase sexuality. (Tr. M. 28–29).

**8.** Dr. Hotchkiss' expertise in the area of sexual problems is supported by the fact that he presently teaches first and second year medical students about sexuality, which requires him to remain aware of current literature on sex. The doctor said that his opinions coincided with the concensus of informed medical and scientific opinion in urology. (Tr. F. 51–52).

sion that plaintiffs' representations were false.

### III

Finally, this Court considers plaintiffs' argument that the ALJ erred in refusing to reopen the proceeding for the purpose of taking evidence on the nature of placebos and the relationship of the placebo effect on "the effectiveness of medical therapy" and to permit plaintiffs to gather results of research on ginseng discussed in the April 25, 1976 New York Times Magazine.

The standard for reviewing this decision was recently stated by this Circuit.

[A]n agency's refusal to reopen the record cannot be deemed arbitrary and capricious unless the new evidence offered, if true, would clearly mandate a change in result, . . . .

*Greene County Planning Board v. FPC*, 559 F.2d 1227, 1233 (2d Cir. 1976).

In this case, it is clear that evidence of a placebo effect of these products would not have altered the outcome of the hearing. Defendants correctly contend that if products are represented as causing a physical reaction when used, and this representation is false, the fact that they incidentally have a favorable psychological effect does not vitiate the falseness of the representations.

Were the courts to protect false advertising because some, or even many, customers benefited from the belief that worthless drugs were improving their sexual situation, 39 U.S.C. § 3005 would be rendered ineffective. It has indeed been documented that just as one's state of mind may create bodily illness, so may it be a cure for physical ailments.[9]

The use of placebos, if at all, should be properly confined to the province of skilled medical personnel who have examined the troubled individual, ascertained that his problem is not physiological, and determined that a placebo may be of aid. In fact, an article offered by plaintiffs regarding placebos suggests the ethical problems of physicians in prescribing placebos.

For many doctors, deliberate use of a placebo to treat a patient involves an ethical problem. The placebo will work only if the physician lies to the patient. Indeed, studies have shown that the more conviction he can muster in his deception the more effective the placebo. "Potent Non-Drugs . . .." *supra.*

Thus, the failure to reopen the hearing to take evidence on the placebo issue did not constitute a violation of due process.

The requirements of due process mandate that an administrative hearing will constitute "a fair trial, conducted in accordance with fundamental principles of fair play and applicable procedural standards established by law. (citations omitted). Although an ALJ has wide latitude in the conduct of a hearing, . . . , "administrative convenience or even necessity cannot override the constitutional requirements of due process." (citations omitted). *Lloyd Carr & Co., et al. v. Commodity Futures Trading Comm'n*, 567 F.2d 1193 at 1196 (2d Cir. 1977).

It is therefore respectfully recommended that defendant's motion for summary judgment be granted.

The foregoing shall constitute my findings on this matter.

Respectfully submitted,

(s) Sol Schreiber

SOL SCHREIBER
United States Magistrate

---

9. *See, e. g.*, "Potent Non-Drugs-Placebos Are Harmless, But they Work", Wall St. Journal, Aug. 25, 1977, at 1, col. 1 (annexed to plaintiffs' supplemental affidavit, 10/21/77).