Ralph J. GALLIANO, et al., Plaintiffs,

v.

UNITED STATES POSTAL
SERVICE, Defendant.

Civ. A. No. 85–2515.

United States District Court,
District of Columbia.

Oct. 21, 1986.

Mark Diskin, Canter, Kent & Sullivan,
Washington, D.C., for plaintiffs.

R. Craig Lawrence, Asst. U.S. Atty.,
Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

Plaintiffs, the Congressional Majority
Committee, Inc. (CMC), an independent po-
litical action committee, its chairman, Ralph
Galliano, and Americans for Phil Gramm
in '84 (APG–84), an independent project of
CMC, seek judicial review of two orders
issued by the Postal Service pursuant to
the postal false representations statute, 39
U.S.C. § 3005. These orders were based
on a finding that plaintiffs were soliciting
political contributions through the mail by
means of materially false representations.
Cease and Desist Order No. CD–305 in-
structs the plaintiffs to cease making such
false representations. False Rep. Order
No. 85–37, as amended, forbids the delivery
of mail and the payment of money orders
to APG–84 responsive to such solicitations
and directs that such mail be returned to
the senders. This case comes before us on
the parties' cross-motions for summary
judgment.[1]

Upon consideration of the parties' briefs,
the extensive administrative record, and
the entire record herein and in accordance

---

1. This case first came to be heard by the court
on plaintiffs' application for a TRO in a related
case, Civil Action No. 84–848. After denial of
the TRO on March 20, 1984, the parties agreed
to a voluntary dismissal of the action without
prejudice. Plaintiffs subsequently filed this ad-
ministrative appeal.

with the following opinion, we hold that 39 U.S.C. § 3005 is constitutional as applied to plaintiffs' solicitations for political contributions. We therefore grant defendant's motion for summary judgment and deny plaintiffs' cross motion.

## Background

The Congressional Majority Committee, Inc. (CMC) is an independent political action committee founded in 1980. In furtherance of principles and ideas shared by its membership, CMC engages in political campaigns by advocating support for certain candidates and making independent financial expenditures on their behalf. Of relevance to this particular case, CMC in 1983 made such a determination to support the candidacy of then Representative Phil Gramm for election to the United States Senate from Texas. CMC accordingly created Americans for Phil Gramm in '84 (APG–84), an independent project of CMC, for the purpose as stated of aiding Representative Gramm's election bid for the Senate.

Over a period of five months in late 1983 and early 1984 plaintiffs mailed over 200,-000 solicitations for political contributions addressed "Dear Conservative Texan" and advocating the election of Congressman Phil Gramm to the Senate.[2] In the course of the solicitation, CMC was described as "an independent political action committee ... dedicated to electing and maintaining a conservative, pro-free enterprise, and pro-defense majority in the United States Congress." R. at 318, 331, 343. CMC also boasted that in 1982, it had raised and contributed over a half million dollars to candidates nationwide. R. at 326, 334, 347. The solicitations explained in turn that CMC had "launched" APG–84 as "a special independent project" of CMC with the "*sole purpose ... to do everything possible to insure the election of Phil Gramm to the United States Senate.*" R. at 318, 331, 343 (emphasis in original). Recipients were directed to mail financial contributions to APG in support of this effort.

Representative Gramm subsequently became aware of contributors who had mailed contributions to the plaintiff in response to their solicitations on the mistaken belief that the money would go directly to Representative Gramm's campaign. The Congressman's only authorized campaign committee, however, was the "Friends of Phil Gramm." Moreover, APG had contributed no funds to Representative Gramm's campaign and as a political action committee would have been barred by federal election laws from contributing more than $5,000. At his urging,[3] the General Counsel of the U.S. Postal Service filed a civil administrative complaint on March 15, 1984, charging that the plaintiffs were conducting a scheme or device to obtain money or property through the mails by means of false representations in violation of 39 U.S.C. § 3005. The substance of the charge was that plaintiffs by means of these solicitations for political contributions had made "directly or indirectly" three material false representations:

(a) Respondents are authorized by Congressman Phil Gramm to solicit and collect funds for his campaign to be elected to the United States Senate;

---

**2.** The first solicitation was mailed in November, 1983. Another mailing occurred in January, 1984, with two revisions. The disclaimer "Not authorized by any candidate or candidate's committee" was added in small print at the bottom of the first page, R. at 328, and a sentence was added to the substance of the letter that "This will enable us operating independently of Phil Gramm and his committee to much more effectively contribute to his election effort." R. at 332. A third solicitation, identical to the second, was mailed in April, 1984.

**3.** Distressed that the plaintiffs were depriving him of contributions he believed he otherwise would have received, Representative Gramm also filed a complaint with the Federal Election Commission. In addition, his official campaign committee brought suit against the plaintiffs for fraud and unauthorized use of a person's name for advertising or commercial purposes under state law in the District Court for the Eastern District of Virginia seeking to enjoin the plaintiffs from using the congressman's name in their literature and from disposing of any contributions received by them. *See Friends of Phil Gramm v. Americans for Phil Gramm in '84,* 587 F.Supp. 769 (E.D. Va. May 18, 1984).

(b) Contributors to Respondents may reasonably expect that Congressman Phil Gramm or his authorized campaign committee will receive the money that is sent to respondent; and

(c) In 1982 Congressional Majority Committee raised and contributed well over one-half million dollars to candidates nationwide.

R. at 275.

The parties presented evidence at a hearing before an administrative law judge (ALJ) on May 4, 1984.[4] An initial decision was issued June 13, 1984, finding that plaintiffs made the representations charged in the complaint, that these representations were both material and false, and that plaintiffs were thus conducting a scheme to obtain money through the mail by means of false representations in violation of § 3005. Upon appeal by the plaintiffs to the Judicial Officer of the Postal Service, a final agency decision affirming the findings of the ALJ was rendered May 2, 1985, together with two remedial orders which required the return to senders of contributions responsive to plaintiffs' solicitations[5] and directing plaintiffs to cease and desist from falsely representing that they have been authorized by another to solicit contributions, that monies contributed to plaintiffs will be directed to an identified beneficiary, and the extent of their past fundraising achievements. These orders remain in force and effect.

Plaintiffs initiated this action on August 7, 1985, seeking judicial review of the Postal Service decision. Plaintiffs challenge the defendant's jurisdiction pursuant to 39 U.S.C. § 3005 to render a decision regarding whether plaintiffs' solicitations contained false representations. They assert that the ALJ permitted improper evidence

to be introduced at the administrative hearing, and allege that the defendant's determination that plaintiffs' mailings contained materially false representations was not supported by substantial evidence, was arbitrary and capricious, and was contrary to law.

## Discussion

Before reaching the merits of the Postal Service's decision, there is first presented the threshold question of the jurisdiction of the Postal Service to issue the orders complained of.[6] Plaintiffs challenge the Postal Service's enforcement of § 3005 as to their mailings on both statutory and constitutional grounds. For the reasons set out below, we hold that § 3005 as written and as applied to plaintiffs' solicitations for political contributions does not unconstitutionally infringe on plaintiffs' First Amendment right of free speech. We then proceed to uphold the merits of the Postal Service's decision.

### A. The Constitutionality of § 3005

"When the validity of an act of the Congress is drawn into question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932). Mindful of this rule of constitutional avoidance, we consider the plaintiff's contention that the legislative history of § 3005 demonstrates that Congress intended the statute to apply only to fraudulent *commercial* schemes. Plaintiff accordingly argues that the statute precludes an enforcement action against an

---

**4.** Plaintiff initially sought from this court a temporary restraining order enjoining these administrative proceedings, which we denied on March 20, 1984.

**5.** The Postal Service's mail-stop order was inadvertently broader in its coverage than had been sought by defendant. Upon joint request, the order was modified on May 7, 1985, to encompass only mail addressed to APG–84 and responsive to the solicitations at issue.

**6.** We note that although plaintiffs raised this jurisdictional challenge in their application for a TRO, they conceded at the hearing "for purposes of argument that § 3005 could conceivably apply properly to a political appeal for money, if it were entirely fraudulent." Tr. at 9. In evaluating plaintiffs' likelihood for success on the merits, we therefore considered only the question whether the letters were misleading as a matter of law. Tr. at 9.

organization soliciting political contributions through the mail.

Section 3005 of Title 39 is one of the oldest federal consumer protection statutes, having been enacted originally in 1872 in language quite similar to the current provision. Even defendants concede that "it was enacted in response to schemes '... which are mostly gotten up in the large cities of New York and Philadelphia ... involving the sale of counterfeit currency by mail ... by thieves, forgers, and rapscallions generally, for the purpose of deceiving and fleecing the innocent people in the country.'" Def.Mot. at 15. Plaintiffs insist that this original purpose is echoed in the legislative history of more recent versions of the provisions. They rely almost entirely on a House Report in support of an amendment to the most recent forerunner of § 3005, 39 U.S.C. § 4005 (1968 Supp. IV). This report stated that the purpose of the section was "to improve one of the major statutory measures for protecting the *consuming public* by eliminating the necessity for establishing an 'intent to deceive' in connection with the issuance of mail-stop orders by the Postmaster General under 39 U.S.Code 4005, which are issued *to protect consumers* who are being victimized by false representations *by promoters* through the U.S. mails." H.R.Rep. No. 235, 90th Cong., 1st Sess. 3 (1967) (emphasis supplied by plaintiffs). Plaintiffs extract from this thin legislative history the conclusion that the "sole target of Section 3005" is the "[p]revention of fraud in the *commercial* context." Pl.Mot. at 18. (emphasis added).

We need not independently explore more fully the legislative history of § 3005. Even were we to agree with plaintiffs that the legislative history establishes a "particular object of Congress's concern"—the commercial sale of products and services by false representations through the mail— "such a showing does not lead to the conclusion that the statute was meant to cover only such activities. To legislate is to generalize, and a law motivated by a desire to eliminate a particular abuse often sweeps within its reach activities that do not themselves display that abuse." *Block v. Meese,* 793 F.2d 1303, 1390–10 (D.C.Cir. 1986), *cert. denied,* —— U.S. ——, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986). Indeed, absent from the language of the statute is any implied or express restriction to *commercial* use of the mails. Section 3005 permits the issuance of mail-stop orders "[u]pon evidence satisfactory to the Postal Service that any person is engaged in conducting a scheme or device for obtaining money or property through the mail *by means of false representations....*" 39 U.S.C. § 3005(a) (emphasis supplied). Whatever the reality of legislative history, "[w]e do not sit to rewrite laws so that they may address more precisely the particular problems Congress had in mind. There is simply no language within the text of the present enactment that would enable importation of the limitations [plaintiffs] suggest." *Block v. Meese,* 793 F.2d 1303, 1310 (D.C.Cir.1986), *cert. denied,* —— U.S. ——, 106 S.Ct. 3335, 92 L.Ed.2d 740 (July 7, 1986).

Exactly the same argument was rejected by the Supreme Court in *U.S. Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981). At issue was another postal statute, 18 U.S.C. § 1725, prohibiting, under pain of criminal sanctions, the deposit into a mailbox of mailable matter on which postage had not been paid. The appellees, two civil organizations, submitted that the statute could not be applied to them "because it was intended to bar the deposit of commercial materials only." *Id.* at 127 n. 4, 101 S.Ct. at 2684 n. 4. Relying in large measure on the statute's express prohibition against the deposit of *"any mailable matter"* without proper postage, the court concluded that the statute applied "to noncommercial as well as commercial materials." *Id.* (emphasis supplied by the Supreme Court).

We turn now to the narrower issue of whether § 3005 may constitutionally be applied to plaintiffs' use of the mails to

solicit political contributions.[7] Plaintiffs argue that regulation by the Postal Service of their use of the mails to solicit financial support for their political activities in the manner provided for by § 3005 impermissibly restricts the exercise of their First Amendment right of free speech. We find this contention overly broad and inapplicable to the facts of this case.

It has long been recognized by the Supreme Court that the postal power granted Congress in Article 1, § 8 of the Constitution includes the power to exclude material from the mails. *See Ex parte Jackson*, 96 U.S. (6 Otto), 727, 732, 24 L.Ed. 877 (1878). Yet, "[t]his power of exclusion is obviously a sensitive one." L. Tribe, American Constitutional Law 252–53 (1978). Also well embedded in our constitutional jurisprudence is the proscription that "[h]owever broad the postal power conferred by Article I may be, it may not of course be exercised by Congress in a manner that abridges the freedom of speech or of the press protected by the First Amendment to the Constitution." *U.S. Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 126, 101 S.Ct. 2676, 2684, 69 L.Ed.2d 517 (1981). We are also aware of the oft repeated admonition of Justice Holmes, dissenting in *Milwaukee Social Democratic Publishing Co. v. Burteson*, 255 U.S. 407, 437, 41 S.Ct. 352, 363, 65 L.Ed. 704 (1921), that "[t]he United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues...."

With these limitations in mind, the Supreme Court in 1948, upheld a predecessor of § 3005, 39 U.S.C. § 259 against First Amendment attack in *Donaldson v. Read Magazine*, 333 U.S. 178, 68 S.Ct. 591, 92 L.Ed. 628 (1948).[8] In that case, two publishers of books and magazines challenged a mail-stop order directing the return of remittances mailed to the publishers in response to a puzzle contest they had sponsored, but which the Postal Service had determined was fraudulent. In holding the fraud order valid, the court expressly rejected the publishers' "contention that the constitutional guarantees of freedom of speech and freedom of the press include complete freedom, uncontrollable by Congress, to use the mails for perpetration of swindling schemes." *Id.* at 191, 68 S.Ct. at 598. As to the publisher's additional argument that the statute was unconstitutionally applied, the court similarly concluded:

> Its future effect is merely to enjoin the continuation of conduct found fraudulent. Carried no further than this, the order has not even a slight resemblance to punishment—it only keeps respondents from getting the money of others by false pretenses and deprives them of a right to speak or print only to the extent necessary to protect others from their fraudulent artifices. And so far as the impounding order is concerned, of course respondents can have no just or legal claim to money mailed to them as a result of their fraudulent practices.

*Id.* at 191–92, 68 S.Ct. at 598–99.

Plaintiffs, however, contend that *Donaldson* does not survive the Supreme Court's more recent decision in *Blount v. Rizzi*, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971). The question raised in *Donaldson* was left undecided by the court in *Blount*, an obscenity case.[9] At issue was the constitutionality of 39 U.S.C.

---

**7.** This issue was not considered during the administrative proceedings because the Judicial Officer lacks authority to rule on the constitutionality of statutes. 39 C.F.R. § 224.1(c)(4)(iii).

**8.** The version of the false representation statute considered in *Donaldson* authorized the Postal Service to forbid use of the mails to any person conducting any "scheme or device for obtaining money or property of any kind through the mails by means of false or fraudulent pretenses,

representations, or promises." 39 U.S.C. § 259 (1946).

**9.** In a footnote, the court noted that the Government had suggested that affirmance by the court "might jeopardize the validity of § 4005 and the continued vitality of *Donaldson*," but observed that "no argument was offered to support the suggestion," and therefore the court did not reach the question. *Id.* at 414–15 n. 2, 91 S.Ct. at 427 n. 2.

§ 4006 (now 39 U.S.C. § 3006),[10] a postal statute closely identical to the false representation statute drawn into question in the instant case. Like § 3005, § 4006 authorized the Postal Service, following a trial-type administrative hearing, to halt use of the mails and postal money orders upon evidence that "a person is obtaining or attempting to obtain remittances of money or property of any kind through the mail for an obscene ... matter" or is using the mails to distribute information about how such items may be obtained. 39 U.S.C. § 4006 (1964). The court held that the "procedure established by § 4006 and the implementing regulations omit those 'sensitive tools' essential to satisfy the requirements of the First Amendment." *Blount*, 400 U.S. at 417, 91 S.Ct. at 428. Of particular importance, the scheme was constitutionally deficient in having "no statutory provision requiring governmentally initiated *judicial* participation in the procedure which bars the magazines from the mails, or even any provision assuring prompt *judicial* review." *Id.* at 417–18, 91 S.Ct. at 429 (emphasis supplied). Plaintiffs in the instant case accordingly argue that the virtually identical procedural scheme implemented under § 3005 unconstitutionally permits *administrative* censorship without necessary safeguards to their First Amendment guarantees. Indeed, they contend *Blount* compels the conclusion that the Postal Service had no jurisdiction to restrain their use of the mails without a prior, governmentally initiated, judicial determination that their solicitations were not entitled to First Amendment protection. We do not accept this conclusion for the reason that an administrative finding of obscenity is on a basis completely different from an administrative finding of fraud. The former invokes important considerations of Free Speech and is a subject concerning which there are differences of opinion. The latter involves a question of fact which does not raise the same problem

because no one has a constitutional right to deceive.

Several courts since *Blount* have ruled that the constitutionality of § 3005, upheld by the Supreme Court in *Donaldson*, was not disturbed by the Court's decision in *Blount*, at least with respect to the field of *commercial* fraud; that is, the First Amendment does not mandate the procedural safeguards defined in *Blount* in § 3005 enforcement actions against *commercial* schemes to defraud the public through use of the mails. *See U.S. Postal Service v. Athena Products, Ltd.*, 654 F.2d 362 (5th Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982); *Original Cosmetic Products, Inc. v. Strachan*, 459 F.Supp. 496 (S.D.N.Y.1978) *aff'd*, 603 F.2d 214 (2d Cir.), *cert. denied*, 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 170 (1979); *Lynch v. Blount*, 330 F.Supp. 689 (S.D.N.Y.1971), *aff'd*, 404 U.S. 1007, 92 S.Ct. 673, 30 L.Ed.2d 656 (1972). This precedent, however, is not necessarily dispositive of the constitutional issue raised in the instant case. The plaintiffs challenge the application of § 3005 to *noncommercial* use of the mails, an issue not reached in any of these decisions. No federal court since *Blount* has considered the constitutionality of § 3005 as applied to noncommercial speech.

Defendant on the other hand argues that the specific representations circumscribed by their enforcement action—concerning who authorized the solicitations, who will spend the money received, and how much money CMC raised in any year are clearly fraudulent and "are unrelated to the political content of [the plaintiffs'] solicitations" and "may be likened to the commercial speech necessary to operate a political committee." Def.Mot. at 20. We agree. Fraud is fraud whatever its context, *i.e.*, whether as a part of speech which is clearly commercial or whether it is cloaked un-

---

10. Also at issue was the constitutionality of a companion provision, 39 U.S.C. § 4007, under which the Postmaster General was permitted to obtain a court order permitting him to detain the defendant's incoming mail pending the outcome of § 4006 proceedings. Both § 4007, and the current provision, 39 U.S.C. § 3007, also authorize such detention pending termination of proceedings under §§ 4005 and 3005 respectively. No such preliminary orders were imposed in the instant case, however.

der the guise of an appeal for political support.

Defendant further argues that its enforcement of § 3005 relates to *false* representations in plaintiffs' solicitations and does not raise constitutional concerns because untruthful speech is not protected by the First Amendment. In support of this position, they rely principally on the decision of the Court of Appeals for this Circuit in *Fields v. Hannegan,* 162 F.2d 17 (D.C. Cir.), *cert. denied,* 332 U.S. 773, 68 S.Ct. 88, 92 L.Ed. 358 (1947). At issue was the validity of a fraud order issued by the Postal Service against mail advertisements for a "scientific product," which the appellant, Rev. E.B. Fields, admitted during the course of the administrative proceedings meant the Bible. Although the content of these solicitations included religious references, the court *in dicta* rejected the contention that the advertisements constituted religious literature. Moreover, the court opined that "[e]ven if it were, the constitutional privilege which he claims would not follow. A religious ingredient is no better defense to a charge of fraud than to a charge of murder." *Id.* at 18. Similarly, a political ingredient is no defense to a charge of fraud in the solicitation of money.[11]

▇ In summary, we hold that § 3005 as written and as applied to the facts of this litigation is constitutional.[12] More specifically, we hold that the proscriptions against the use of the mails to obtain money by means of false representations are valid whether such false statements appear in commercial speech or as a part of political appeals which do not fall neatly into the commercial category. Fraud is fraud wherever found and specifically covers "a scheme or devise for obtaining money ... through the mail by means of false representations...." § 3005(a).

## B. *The Factual Validity of the Administrative Orders*

It is not disputed that the basis for judicial review is provided by the Administrative Procedure Act. 5 U.S.C. § 704. Furthermore, since "the power vested in the Postal Service may not be interfered with by the courts unless it exceeded its authority or is palpably wrong", 5 U.S.C. § 706(2)(A), (E), the scope of review is confined to a determination of whether the administrative action is supported by substantial evidence.

▇ From an examination of the record, it is clear to us that the representations as alleged have been proven by substantial evidence. First, the representation that Gramm authorized plaintiffs to solicit and collect funds for Gramm's senatorial candidacy is clearly false, as shown by Gramm's affidavit. Second, the representation that contributors may reasonably expect that Gramm or his authorized campaign committee will receive the money sent to plaintiff is also false particularly in view of the fact that Gramm's campaign never received any of the funds raised and because plaintiff's organization as a PAC was prohibited from contributing more than $5,000 to a single candidate. Finally the representation con-

---

**11.** Plaintiffs argue that "[t]here can be no doubt that defendant's issuance of the mail-stop and cease and desist orders have had a chilling effect on plaintiffs' First Amendment right to support candidates of their choice now and in the future." Pl.Mot. at 10. Plaintiffs overlook an entire line of authority upholding criminal prosecutions for mail fraud against First Amendment attack. *See, e.g., United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944) (upholding mail fraud conviction for knowingly misstating belief in spiritual healing); *United States v. Margiotta,* 688 F.2d 108 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983) (upholding mail fraud conviction for political corruption); *United States v. Rasheed,* 663 F.2d 843 (9th Cir.1981), *cert. denied,*

454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982) (upholding mail fraud conviction for knowingly misstating a belief in the spiritual multiplication of money).

**12.** We are familiar with Friends of *Phil Gramm v. Americans for Phil Gramm in '84,* 587 F.Supp. 769 (E.D.Va.1984). Plaintiffs' reliance on this case is misplaced in that it involved claims under state law and primarily concerned defendant's unauthorized use of Phil Gramm's name. It was heard on plaintiff's application for a preliminary injunction and the issue of fraud did not surface. On the other hand, the instant case arises under the federal postal laws directed against the obtaining of money through fraudulent representations.

cerning plaintiffs' previous level of funding in 1982 is also false as shown by the filings with the Federal Elections Commission. This last representation is also material because on its face it gave credibility to plaintiffs' request for contributions and its representations as to how the funds were spent. Based on the foregoing, we have no problem with the administrative decision of the Postal Service and affirm it.

### Conclusion

The provisions of 39 U.S.C. § 3005 have a wide reach and are directed at any scheme using false statements of fact to solicit contributions by mail. Such solicitations are not protected because they also advocate election of a particular candidate to political office. Many sins and injustices have received constitutional protection and immunity from attack by virtue of the mantle of the First Amendment. This is not an example of such a situation. False representations to obtain money through the mails do not merit constitutional protection. The removal of these false representations from future solicitations can be easily accomplished without affecting plaintiffs' rights to political expression.

An order consistent with the foregoing has been entered this day.